By the Court
 

 We have considered these Appeals, and are now ready to give our judgment.
 

 It has been very truly observed, that this Appeal is a case of importance, not only with regard to the subject in contest, but also with regard to the great Questions of Law, which the investigation and discussion of the merits necessarily introduced; and being before this Court for their determination, the Judgment and Decree of this Court must be directed by the Resolves and Ordinances of Congress, and, where they are silent, by the Laws, Usage and Practice of Nations.
 

 Upon these grounds, the case has been considered and argued by the counsel on both sides; and considered so thoroughly and argued so copiously, fully and ably, that we have now every possible light of which the subject admits
 

 
 *2
 
 The General Question is, "Whether on all the circumstances of this case, the Ship or Cargo, or both, or any part of the Cargo, be a prize; and as such ought to be condemned and confiscated?”—The Libellants contend that both Ship and Cargo are prize—if not the Ship, yet the Cargo is prize; if not the whole of the Cargo, yet the principal part of it must be condemned.
 

 Different grounds have been taken to support these several positions—One ground is taken to affect both Ship and Cargo; other and different grounds to affect the Cargo; other and different grounds to affect the principal part of it.
 

 The argument directed against both Ship and Cargo is this: By the Law of Nations, after a capture and occupation for twenty-four hours, the Property captured is transferred to the Captors: But the Ship and Cargo in question were captured and occupied twenty-four hours—therefore the property was transferred to the Captors—and as the Captors were British subjects, the property was British property, and therefore legally attacked and captured by the American Privateer
 
 Ariel.
 

 There is no doubt, but that a capture authorized by the Rights of War transfers the property to the Captor; but the Question is, whether a Capture not authorized by the rights of war can have that legal operation: for, the Claimant says, “that the Ship was not originally
 
 British
 
 but
 
 Dutch
 
 and Neutral property, and that the Cargo also was not originally
 
 British
 
 bu
 
 t
 
 Neutral Property, in consequence of Articles of Capitulation, stipulated on the conquest of Dominica, by the arms of his most
 
 Christian
 
 M
 
 ajesty."
 

 All the authorities cited on cafes of Capture authorized by the rights of war, are where the property captured was the property of an enemy: not an instance has been produced where a capture, not authorized by the rights of war, has been held to change the property; but many authorities have been brought to shew, that no change is effected by such capture. To say that a capture which is out of the fanction and protection of the rights of war, can nevertheless derive a validity from the rights of war, is surely a contradiction in terms. The rights of war can only take place among enemies, and therefore a capture can give no right, unless the property captured be the property of an enemy. But it is stated, that both Ship and Cargo, in the present cafe, were originally (that is antecedently to the
 
 British
 
 capture) in the predicament
 
 of
 
 neutral property: No property then was transferred by the capture, and of consequence the property in question was not upon the ground it has been considered—British property. "But, it is said, the fact cannot be ascertained, that the “capture in this cafe was not authorized by the rights of war—"for it depends upon the will of the fovereign, whether an out
 
 *3
 
 rage and capture,
 
 supra altum mare,
 
 by his subjects of te property of subjects of another nation, shall be an illegal and piratical act, or an act of hostility: That the sovereign is not obliged to promulge his will on the moment he makes “ war, and that as the human will, has no physical existence, it cannot be ascertained but by a declaration of it by the sovereign himself, and therefore
 
 non constat,
 
 but that the capture “ in the present case was authorized by the
 
 British
 
 crown, and “ so a fair act of hostility, authorized by the rights of war.”
 

 This argument is ingenious and plausible, but not solid. As the state of nature was a state of peace, and not a state of war, the natural state of nations is a state of peace and society, and hence it is a maxim of the law of nations, founded on every principle of reason, justice and morality, that one nation ought not to do an injury to another. As the natural state (that of nations) is a state of peace and benevolence, nations are morally bound to preserve it. Peace and friendship must always be presumed to subsist among nations; and therefore he who founds a claim upon the rights of war, must prove that the peace was broken by some national hostility,and war commenced but mere conjecture, supposition and possibility, can render no competent evidence of the fact. But it is said “here was a national hostility—viz. The capture by the
 
 British
 
 privateer; " and the act of the subject is the act of the sovereign.”
 

 The act of the subject can never be the act of the sovereign unless the subject has been commissioned by the sovereign to do it: But, in this case, there is no evidence that the commission of the
 
 British
 
 privateer extended to property, under the circumstances of the property captured.
 

 But it is asked “what private or public mischief can be ap
 
 p
 
 rehended from considering property under the circumstance
 
 s
 
 of this case as prize: For, the wrong was committed by the "
 
 British
 
 privateer, and therefore the
 
 British
 
 nation is chargeable with it, and bound to make compensation.”
 

 We are inclined to think, that were the claimants to apply to the
 
 British
 
 crown for compensation, they would be told “that " altho’ satisfaction were done, yet it would be in proportion only to the wrong done by the
 
 British
 
 privateer, which consisted only in the seizure and detention. But if compensation was expected for ship and cargo, they must look to that nation for it, whose courts declared a condemnation, and whose subjects reaped the fruits of it.”
 

 aBut, ’tis 'alledged, that “ the late ordinance of Congress is express and decided, that after a capture and occupation for twenty-four hours the property captured shall be prize.”
 

 The ordinance of Congress certainly speaks of a legal capture; to admit a different construction would be a violence both to the
 
 *4
 
 terms and spirit, or intention, of it. Prize is generally used as a technical term to express a legal capture; and Congress having adopted it in framing of the ordinance, the general sense or acceptation of it must determine its import and signification. But suppose the term
 
 prize
 
 merely imported a capture, without any reference to its legality, and that it was the spirit and intention of the ordinance to subject to
 
 prize
 
 all captures, both legal and illegal, after twenty-four hours; it does not follow that it would affect the present case. The municipal laws of a country
 
 cannot
 
 change the law of nations, so as to bind the subjects of another nation; and by the law of nations a neutral subject, whose property has been illegally captured, may pursue and recover that property in whatever country it is found, unless a competent jurisdiction has adjudged it prize. The municipal laws of a country can only bind its own subjects.
 

 aThe ordinance of Congress is in truth a new regulation of the
 
 jus post liminii,
 
 and limits it to a recapture within twenty-four hours, and therefore can only relate to the subjects of the
 
 United
 
 States: it adopts the ordinance of
 
 France,
 
 and that ordinance relates only to the subjects of
 
 France.
 
 In both cases, with regard to the owner,
 
 a subject,
 
 the property captured is not passed away before the expiration of twenty-four hours. But put the case of a capture and the sale of it before twenty-four hours to a neutral subject; the sale is certainly good and conclusive upon the owner; for the question must be decided by the law of nations, and by the law of nations, the property captured is transferred to the captor as soon as it is taken.
 

 Both the ordinances therefore of
 
 Congress
 
 and of
 
 France,
 
 in our opinion, relate only to property captured from a subject and recaptured; and not to property captured from a neutral and recaptured. It is said, “that arguments drawn from the law of “nations with regard to
 
 Pirates,
 
 do not apply to the present “case, because pirates have not the rights of war.”
 

 If the principal fact was properly attended to, the present case could not be questioned. Whence is it that pirates have not the rights of war? Is it not because they act without authority and commission from their sovereign? And is it not objected and proved, that the
 
 British
 
 privateer, with regard to the property captured, acted without commission and authority from the
 
 British
 
 crown? So far from there being any dissimilarity in the cases, it is in fact the very case in judgment, considering it on the first ground of argument.
 

 But, it is alledged, “that the capture by the
 
 British
 
 privateer “must be considered as legal: For, after a capture and occupa-“tion for twenty-four hours, the legality of the capture is not “open for question and examination.”
 

 
 *5
 
 This doctrine must never be suffered; there is no example or precedent for it to be found in any of our books; it breaks down and destroys the distinction between right and wrong; it gives a sanction to injuctice, robbery and piracy, and it is reprobated by the laws, usage and practice of nations. Lord Mansfield, in the case so often quoted, 2
 
 Burr.
 
 693, says, “The question, whether the property is transferred by the capture, can only “happen between the owner and vendee, and between the “owner and the recaptor.” But the question could never happen between the owner and the recaptor, if the legality of the capture was not examinable on every libel for condemnation as prize. The question is—Prize or no Prize? That is whether the capture be legal or not.
 

 The legality of a capture is open for question and examination, till a competent jurisdiction has decided the question, and a decree passes for condemnation as prize; then, and not before, all further questions and examinations are precluded; then, all parties, and all foreign courts, are estopped to say, “the capture is not legal;” and if the decree be erroneous or iniquitous, the party injured must apply for redress to that nation, whose courts have committed the error or iniquity.
 

 “Great difficulties, it is said, will arise, if capture and occu-“pation for 24 hours should not be considered as conclusive evi-“dence of property in the captor, and that the capture was le-“gal.” And it is asked “must a regular title be deduced from “the first proprietor to the captor, as in case of an ejectment at “the common law?” And “ must common law strictness, in “making out titles, be adopted in Admiralty courts?”
 

 Every libel states a title to the thing captured; the title must not only be stated, but it must also be proved. It is stated in the libel in this case, that the property captured
 
 was British
 
 property, the evidence to prove it is, “ possession and occupation of it by the
 
 British
 
 privateer."
 

 A title thus traced is a good one, in a court of common law, except in a single case: it is a good title against all the world
 
 except the right owner.
 
 This exception is founded on every principle of reason and justice; it ought not only to be adopted in courts of common law, but in every court, where the distinction between right and wrong is preserved, and justice regarded. Possession and occupation ought, upon a question of property, to have the same influence in courts of admiralty, as in courts of common law: it ought to be considered as a good title, and conclusive upon all mankind except the
 
 right owner.
 
 Such a title is clear of all difficulties in the proof of it; it excludes the necessity of a regular deduction of title from the first proprietor down to the captor; it is disengaged from those entanglements, which result from a variety of possible changes and mutations of the
 
 *6
 
 property; and it cannot be shook, but when every honest man will say it ought to be shook;—when the right owner appears and proves his property. We have now done with the observations and reasoning, that relate to the first ground of argument: and are of opinion, that if the ship and cargo were originally neutral property, the capture and occupation for 24 hours did not change it into
 
 British
 
 property and make it prize.
 

 But another ground has been taken to affect the cargo: The libellants say, "that the cargo is the produce and growth of Do
 
 minica;
 
 that the said cargo is the property of
 
 British
 
 subjects of that Island; that therefore it was not neutral property, but
 
 Bri
 
 tish, and originally prize."
 

 To this the claimants reply, "that after the declaration of independence, and after the alliance of these States with
 
 France,
 
 the
 
 British
 
 Island of
 
 Dominica
 
 was taken by the arms of his most
 
 Christian
 
 Majesty; that before the reduction of it, articles of capitulation took place, by which the owners and possessors of estates in the Island were secured in the possession and enjoyment of them, and indulged with carrying on trade and commerce, upon an equal footing with subjects of France; that the said Island since the conquest has been under the protection and government of
 
 France
 
 ; that before the failing of the ship a passport was obtained from the
 
 French
 
 Governor, requiring all commanders of
 
 French
 
 armed vessels, and all commanders of
 
 Spanish
 
 and
 
 American
 
 armed vessels, the allies of France, not to impede or obstruct the passage of said ship, the cargo on board being property of capitulants; that the said articles of capitulation bind
 
 America
 
 as the ally of France; that therefore the cargo, although the property of
 
 British
 
 subjects, yet it is
 
 British
 
 property protected from capture, by the articles of capitulation; and that it is in the predicament of neutral property, and therefore was not originally prize.”
 

 Upon these facts and allegations two capital questions arise: 1st. Whether the cargo was
 
 British
 
 property, protected by the articles of capitulation against
 
 French
 
 and
 
 British
 
 captures?
 

 2d. Whether
 
 America,
 
 as the ally of
 
 France,
 
 is bound by the articles of capitulation?
 

 With regard to the first question it is contended, on a variety of grounds, that this cargo is not protected from capture by the articles of capitulation.
 

 1st. Because the capitulation does not extend to property shipped and on passage at sea.
 

 2d. Because the owners were principally non-residents at the time of capitulation, and, therefore, although owning estates at
 
 Dominica,
 
 cannot be considered as capitulants.
 

 
 *7
 
 3d. Because the proceeds of this cargo were to be remitted from
 
 Holland
 
 to the owners residents in
 
 Great Britain.
 

 4th. Because the voyage was in fact calculated for
 
 Great Britain
 
 and for
 
 Amsterdam
 
 in
 
 Holland,
 
 and therein was a breach of the articles of capitulation, and a forfeiture of its protection.
 

 5th. Because the cargo on board was the property of
 
 British sub
 
 jects not residents, nor owning estates, in
 
 Dominica,
 
 and therefore not within the protection of the capitulation.
 

 The first, fourth, and fifth grounds, apply to the whole cargo, and the second and third to the principal part of it.
 

 Whether the articles of capitulation extend protection to property after shipped and on its passage at sea, depends on the 13th article, and the general tendency and scope of the capitulation itself.
 

 The main design of the capitulants was, to obtain a perfect security for their estates and property; and a full exercise of all the rights of property and ownership; And one great, object with the
 
 French
 
 General was, to secure to
 
 France
 
 the commerce of the Island, and all its advantages, emoluments and revenues; but it was inconsistent with the design and object, which both had in view, to open to
 
 French
 
 and
 
 British
 
 capture the produce, of the Island, and property of the capitulants, as soon as a-float at sea.
 

 This would have injured the rights of property, discouraged the labour and agriculture of the Island, lessened its exports, and diminished the revenues of its government.
 

 But the thirteenth article seems decisive: it stipulates "that “the
 
 Merchants
 
 and
 
 Inhabitants
 
 of this Island, included in the
 
 “
 
 present capitulation, shall enjoy all the privileges of trade, and “on the same conditions as are granted to the subjects of his
 
 “most
 
 Christian Majesty, throughout the extent of his domi-“nions.”
 

 By this article the capitulants are placed, with regard to their trade and commerce, on an equal footing with the subjects of France; every commercial privilege which the subjects of
 
 France
 
 enjoy is conceded to the capitulants; but it is certainly one privilege which a subject of France enjoys, that his property at sea, in the line of a fair trade and commerce, shall not be captured as prize by
 
 French
 
 subjects; consequently the cargo in this case, which is the property of capitulants, cannot be subject as prize to
 
 French
 
 captures. But is it asked, "was it not subject to
 
 British
 
 capture"? The article, it is said, stipulates, that the trade shall be carried on upon
 
 the like condition
 
 with the
 
 French
 
 trade, and the
 
 French
 
 trade is subject to interruption by
 
 British
 
 capture.
 

 Had the capitulation stipulated generally, that the capitulants should exercise all the rights and privileges of trade exercised by
 
 *8
 
 the subjects of France, the case would have been a clear one; the capitulation then might have been fairly considered as a compact between the
 
 French
 
 and
 
 British
 
 crowns, that a trade should have been carried on by the captulants, in the extent of the
 
 French
 
 trades, and consequently that neither crown could interrupt it by captures without a breach of faith: The difficulty arises upon the provision in the article, that the privileges of trade shall be considered
 
 upon the conditions
 
 of the
 
 French
 
 trade, which it is said implies, “that as the
 
 French
 
 trade is exposed to
 
 British
 
 captures, so must be the trade of the capitulants.”
 

 It is observable, that this article is propounded on the part of the capitulants, and the
 
 conditions
 
 stipulated must have been in their ideas productive of some benefit and advantage: Was it for the benefit and advantage of the capitulants, that their property so captured should become the property of the captors, and liable to confiscation? Certainly not.
 

 But admit, that this article was propounded on the part of the
 
 French
 
 general; what beneficial object could he have in stipulating, that this trade should be exposed to
 
 British
 
 capture? Was it for the interest and advantage of the
 
 French
 
 crown, that this fresh accession to its commerce should be harassed and discouraged by
 
 British
 
 capture? Certainly not.
 

 A construction then so pointedly against the interest of both parties, can never be the right one: The truth is, the condition expressed in the article refers only to the duties, imposts and regulations of commerce.
 

 But if the construction was admissible, that it was for the interest of the
 
 British
 
 capitulants, that this trade should be liable to such interruption by
 
 British
 
 captures, what must we think of the opinion of the eminent Lawyers of
 
 Great Britain
 
 which have been cited? They say, that this trade is protected by the capitulation against Bri
 
 tish
 
 captures: Deciding then against the contended interest of the capitulants, do not their opinions from such a circumstance acquire a great additional force? The
 
 British
 
 Crown by its proclamation gives incontestible evidence, that the property of the capitulants is not exposed to
 
 British
 
 capture; for it refers to the capitulation, asserts the protection it gives, and confirms it.
 

 With regard then to the
 
 question, "
 
 whether the capitulation extends protection to property, when shipped from the Is-“land and afloat at sea?”
 
 We are of opinion
 
 that
 
 it does.
 

 But it is objected, on the second ground of argument, that the cargo was principally the property of residents in
 
 Great Britain
 
 at the time of the capitulation, and, therefore, although owning estates in the Island, yet not entitled to the benefit of the capitulation.
 

 
 *9
 
 It will be proper in the consideration of this objection to attend to the 9th, 12th and 13th articles of capitulation.
 

 The 9th article says: “The absent inhabitants, and such as “are in the service of
 
 Great Britain,
 
 shall be maintained in the “possession and enjoyment of their estates; which shall be ma-“naged for them by their attornies.”
 

 The 12th article says : “That widows and other inhabitants, “who, through illness, absence, or any other impediment, cannot “immediately sign the capitulation, shall have a limited time “to accede to it."
 

 And the 13th article says : “The inhabitants and merchants of this Island included within the prefent capitulation, shall “enjoy all the privileges,” &c.
 

 The fact is admitted, that the cargo is the produce and growth of
 
 Dominica,
 
 and that the principal part of it belongs to
 
 British
 
 subjects; possessing estates in the Island, but non-residents at the time of the capitulation
 

 It is objected, “that with regard to such non-residents, the operation of the 9th article extends no farther than to protect the estates of such persons from seizure and confiscation, by the rights of conquest; that the 12th article extends only to those who have acceded to the capitulation within the time limited, and that the 13th article extends only to such inhabitants and merchants as are included at the time of capitulation, and not to non-residents.
 

 To this it is replied, “that by the 12th article absentees may come in within a limited time and accede to the capitulation, and that then they fall within the description of the 13th article, which says, “the inhabitants and merchants of this island, “included within the capitulation, &c.”
 

 Upon these allegations and facts, two questions arise:
 

 1st. Whether the claimants who were non-residents and absentees at the time of capitulation have acceded to it?
 

 2d. Whether having acceded to it, they come within the description of the 13th article, and are entitled to the rights and privileges of trade there conceded?
 

 We have carefully examined all the bills of lading and the depositions annexed, and find that the property mentioned in each bill is proved, by the respective depositions, to be the property of a
 
 British
 
 capitulant. Whether he personally, or by attorney representatively, subscribed the capitulation, does not appear; nor do we think it material, for the maxim is a true one,
 
 qui facit per alium, facit per se.
 

 It is proved by the deposition of Mr.
 
 Fitzgerald,
 
 that in the general sense and opinion of the people of the Island, the subscription of an attorney for his principal was sufficient, and Mr.
 
 Fitzgerald
 
 mentions an instance, where a principal was refused by
 
 *10
 
 the
 
 French
 
 Governor the benefit of the capitulation, because his attorney had neglected to subscribe for him. He also proves, that it was the uniform and uninterrupted practice of the Island, for principals non-residents to subscribe by attorney; which would not have been the case, unless such mode had been agreeable to the spirit and intention of the capitulation.
 

 But it is said, “that none could accede to this capitulation but such as were in a capacity to stipulate a neutrality, and that non-residents, in
 
 Great Britain,
 
 although owning estates in
 
 Dominica,
 
 could not consistently with their allegiance engage a neutrality of conduct.”
 

 It must be admitted, that where the supreme authority is competent to protect the rights of subjects, a subject cannot divest himself of the obligation of a citizen, and wantonly make a compact with the enemy of his country, stipulating a neutrality of conduct; but certainly he may enter into such an agreement, when it is no longer able to give him protection. In the present case, the
 
 British
 
 Crown was not able to secure to the owners their estates in Dominica, and therefore they had a natural right to make the best terms they could, for the preservation of their property; for, it is a general maxim of the law of nations,
 
 “
 
 that althouga private compact with an enemy may be prejudicial to a state in some degree, yet if it tends to avoid a greater evil, it shall bind the state, and ought to be considered as a public good.” The Owners therefore of the cargo in question, though non-residents at the time of the capitulation and out of the reach of personal injury, yet having estates in the Island, in danger of confiscation by conquest, had a right to avail themselves of the terms proffeed by the capitulation, and engage a neutrality of conduct, by acceding to it.
 

 But it is said "that very possibly some of these non-residents are at this day in the military service of
 
 Great Britain.”
 

 Our opinion is, that the 9th article, with regard to all absentees, and such as are in the service of
 
 Great Britain,
 
 only exempted their estates from forfeiture by the rights of conquest. The rights and privileges of trade are considered only by the 13th article. No one can bring himself within the 13th article, that has not signed the capitulation, and every one who signs the capitulation engages a neutrality of conduct. If any one subscribing the capitulation should afterwards go into the service of
 
 Great Britain
 
 and commit acts of hostility against
 
 France
 
 and
 
 America,
 
 he would break his engagement of neutrality, and forfeit all the rights and privileges of trade, and his property captured at sea would become prize.
 

 It is a rational construction to consider neutrality as the great basis of the capitulation. The estates indeed of absentees, and such as were engaged in the service of
 
 Great Britain,
 
 appear to
 
 *11
 
 have been secured at all events from forfeiture, without a stipulation for neutrality; but with regard to the rights and privileges of trade, they can be only exercised by those who have acceded to the capitulation and engaged a neutrality. Admitting then that the owners of estates in the Island of
 
 Dominica,
 
 and non-residents and claimants in the cause, have properly acceded to the capitulation
 
 ;
 
 the mere question is, whether they come within the 13th article, and are entitled to the rights and privileges of trade there conceded? As we conceive that this article was conceded as a liberal compensation for the stipulation of neutrality, we have no doubt but that these non-residents, who owned estates in
 
 Dominica
 
 and have acceded to the capitulation and neutrality, come within the description of the 13th article, and are entitled to all the rights and privileges of trade, which it provides for and stipulates.
 

 The third ground of argument, on which it is contended, that this cargo is not protected by the capitulation against capture, is this: That the proceeds of the cargo were to be principally remitted to
 
 Great
 
 Britain, on the order of the owners resident there, and therefore that this cargo was in a line of trade not within the protection of the capitulation. We have already given it as our opinion, that the 13th article gives the capitulants a protected trade to every port, where the trade and commerce of
 
 France
 
 extends. And we have given, it as our opinion, that with regard to the rights and privileges of trade, there is no difference between the inhabitants, and those absentees, non-residents, who have acceded to the capitulation and neutrality. The only circumstance then to take this cargo out of the protection of the capitulation must be the letters of advice of the agents at
 
 Dominica,
 
 advising the consignees at Amsterdam, to whom the cargo belonged, and that the proceeds of the principal part of it were to be at the disposal and order of the owners, residents in
 
 Great Britain.
 
 We cannot see the force of this circumstance in the extent contended for, if the agents rightfully exported the produce of the estates of those, non-residents, in conformity to the capitulation. The letters of advice cannot give this commercial act a different complexion; the agents could not ship this property in their own right, without taking upon themselves a risk of the voyage; and the Bills of Lading necessarily allowed that the proceeds were at the disposal of the owners. Could agents have acted with more propriety? Every step they took was the natural result of the rights of trade conceded by the capitulation. But it is objected, “that the both article shews, that no remittance was to be made, but for education and support of children.”
 

 The article is this: “The inhabitants of the Island shall have, liberty to send their children to
 
 England,
 
 to be there educated,
 
 *12
 
 and to send them back again, and to make remittances to them while in
 
 England.”
 

 This article by no means proves, that no remittances were to be made of proceeds on sales in a neutral country; tho’ the children might have had remittances in that train of intercourse, yet the mode might have been thought too circuitous and dilatory. A remittance in a direct line was more eligible. Besides, remittances on sales abroad could only be in money or, bills; but by this article there is no limitation of the species of remittance, and it may be in produce.
 

 The capitulation must receive a liberal construction. It was the fabrick of a great, enlightened, General, and every part of the structure exhibits a liberality and grandeur of spirit, that does honor to human nature. It is said, that if the property of the capitulants is thus protected from capture, it is in a better situation than
 
 French, American or British
 
 property; it it precisely in the situation of neutral property. It was far from being the with of the capitulants to have had their property placed in such a predicament upon the terms it was done. They were reduced and obliged to submit to it by force of arms. But the situation of those people is mentioned as a happy one: If to be a conquered people, and inforced to all the contingent consequences of a conquest, be a pleasing condition, these people may then boast of their being in an happy one.
 

 It is said the
 
 British
 
 crown must be benefited by this condition of their subjects.
 

 The
 
 British
 
 crown may indeed be benefited in some degree; it was not meant to deprive
 
 Great Britain
 
 of every benefit; the draws some benefit from having a few remittances made from sales abroad, to a few of her subjects in
 
 England,
 
 owning estates in
 
 Dominica.
 
 But then to gain the advantage the yields up the personal service of those subjects, for they are bound to observe a neutrality. But has
 
 Great Britain
 
 lost nothing by the conquest? Who possesses the Island of
 
 Dominica
 
 ? Who possesses all the advantages and benefits of its trade? Who has obtained its commercial revenues?
 

 It is true the is not at the expence of the government of that island. But it is true the has lost, Island, government and revenues. When the consignees disposed of the cargo, they became debtors for the monies received. The making of remittances in satisfaction of debts, although to subjects of a nation at war, is no violation of the duties of a citizen. Nor will the usage and practice of civilized nations forbid it. Tobacco shipped to
 
 France,
 
 with an avowed intent to remit the proceeds to
 
 England
 
 for the payment of debts, would not be prize on an
 
 American
 
 capture.
 

 We come now to the fourth ground of argument, on which it
 
 *13
 
 is contended, that this cargo is not within the protection of the articles of capitulation; that is, that the voyage was calculated for
 
 Great
 
 Britain, and not for
 
 Amsterdam
 
 in
 
 Holland,
 
 and therefore in breach and out of the protection of the capitulation. This argument is grounded upon several circumstances and upoevidence, that point at some latent object, but do not speak decisively upon it: They prove a secrecy and concealment, with regard to the voyage to
 
 Dominica,
 
 and the taking a cargo there; but all these circumstances are easily explained, without adopting the idea that the voyage was intended for
 
 Great Britain.
 
 What is suggested in
 
 Capt. Waterburgh's
 
 letter, was a mere precautionary measure to avoid
 
 British
 
 cruizers, that perpetually harrassed the
 
 Dutch
 
 trade, by capturing their vessels. In the same letter he mentions the capture of a
 
 Holland
 
 ship which had been carried into
 
 St. Kitts and
 
 released; the letter is dated
 
 Eustatia;
 
 and the manœuvres he mentioned were to secure the voyage to
 
 Dominica.
 

 The voyage
 
 from Dominica
 
 to
 
 Amsterdam,
 
 we have no doubt, was planned in
 
 London,
 
 between the capitulants there, owning estates in
 
 Dominica,
 
 and
 
 Daniel Hesbuysen,
 
 agent for
 
 Brantlight
 
 &
 
 Son.
 
 The letter addressed, to
 
 Moreson, at Dominica, was
 
 dated at
 
 Amsterdam,
 
 tho' wrote in
 
 London,
 
 because
 
 Brantlight
 
 &
 
 Son
 
 lived at
 
 Amsterdam,
 
 and because the cargo was to be consigned to them at
 
 Amsterdam,
 
 and it was dated the day of the date of his own letter, which inclosed it, because it was then wrote. As for the secrecy enjoined in
 
 Brantlight
 
 &
 
 Son's
 
 letter to
 
 Captain Waterburgh
 
 while at
 
 Eustatia,
 
 with regard to the voyage to
 
 Dominica
 
 and the taking a cargo there, we cannot think they had any other motive for it than such as often influences merchants in the conduct of a fair trade, to keep to themselves their commercial plans. But what force can there circumstances have when opposed by the positive evidence that is produced? The Bill of Lading and a variety of letters from the shippers and attornies for the owners in
 
 London,
 
 some addressed to
 
 Brantlight
 
 & Sonand others to the owners, prove that the voyage was for
 
 Amsterdam;
 
 all the ship papers also prove it. But the depositions of
 
 Waterburgh
 
 and
 
 Moreson,
 
 to whom the ship was consigned, and by whom the ship was loaded, are conclusive: They, upon clearing out of the ship, swear expressly that she was destined for
 
 Amsterdam.
 

 We are now come to the last ground, which has been taken to prove the cargo not to be protected by the articles of capitulation, which is: That the property of the cargo on board, was the property of
 
 British
 
 subjects, not residents or owning estates in
 
 Dominica.
 
 But what is the evidence produced to prove this? It is a letter from
 
 Moreson
 
 to
 
 Brantlight & Son,
 
 in which be mentions the alarm occasioned by the rupture between
 
 Great Britain
 
 and the
 
 Stales General,
 
 and the fears and
 
 *14
 
 apprehensions the merchants and shippers were under, relative to putting property on board a
 
 Holland,
 
 vessel; he afterwards mentions the arrival of the king’s proclamation, protecting
 
 Holland vessels
 
 from capture, and says “even then no one but
 
 Mr.
 
 “Kender
 
 Mason
 
 and myself would put a hogshead on board
 
 “your
 
 ship, as the king’s proclamation laid so much blame on
 
 “your
 
 city; but we have agreed, &c.” and then says they havagreed to ship, and assigns the reasons.
 

 The fact does not appear, that
 
 Kender Mason
 
 had any property at all in Dominica, nor that he had any attorney or agent; it appears he lived
 
 in London, and
 
 was a correspondent of
 
 Moreson's
 
 House in
 
 Dominica.
 
 It appears
 
 Daniel
 
 Hesuysen, as agent for
 
 Brantlight & Son,
 
 obtained a letter from this
 
 Kender Mason
 
 addressed to
 
 Moreson,
 
 which he enclosed to
 
 Captain Waterburgh
 
 at
 
 St. Eustatia,
 
 and in consequences of which
 
 Captain Waterburg
 
 was ordered to
 
 Dominica
 
 . This letter was probably delivered by
 
 Waterburgh,
 
 as it is not to be found among the ship’s papers. We have no evidence of the contents of this leter, but it appears to us, to have been a letter recommending
 
 Brantlight
 
 &
 
 Son
 
 to
 
 Moreson's
 
 House. The plan of the voyagbeing settled in
 
 London,
 
 it was natural to obtain letters of introduction from thence.
 

 But
 
 Moreson's
 
 letter, it is objected, speaks expressly of
 
 Kender Mason having
 
 shipped property, on board, and there is no proof, that he is a
 
 British
 
 capitulant, and therefore, here was property on board belonging to a
 
 British
 
 subject, who was neither a resident in
 
 Dominica,
 
 nor an owner of estate there, and, consequently, it was
 
 British
 
 property not protected by the capitulation.
 

 Moreson’s
 
 letter, if good evidence, to prove the fact with regard to
 
 Kender Mason,
 
 must be taken as good evidence to prove every fact stated in it; for it must be taken altogether and admitted, or rejected
 
 in toto.
 

 He says then,
 
 “
 
 No one but
 
 Kender Mason
 
 and myself, would “put a hogshead on board, &c.”
 
 Moreson
 
 then, as well as
 
 Kender Mason,
 
 had property on board.
 
 Moreson
 
 also mentions in his letter, that afterwards there was an agreement to ship generally, and assigns the reasons. The shippers must be other persons besides Ma
 
 son
 
 and
 
 Moreson
 
 : So that even upon the evidence of
 
 Moreson’s letter, Kender Mason
 
 could have but
 
 a part
 
 of the cargo, the
 
 quantum
 
 of which is not at all ascertained.
 

 But we are inclined to think, that this letter of
 
 Moreson's,
 
 with regard to
 
 Kender Mason
 
 shipping property on board, is a mistake. Kender
 
 Mason
 
 was certainly not at
 
 Dominica,
 
 and yet the letter conveys that idea: "
 
 A
 
 general panic had seized the merchants, they would not ship until the arrival of the King’s Proclamation, and even then
 
 Kender Mason
 
 and myself were the only persons who would ship a hogshead.” The person
 
 Moreson
 
 
 *15
 
 meant to speak of must have been on the spot. He was one whom the panic had not taken hold of; he was one who with
 
 Moreson
 
 took the resolution to ship, notwithstanding the alarming rupture between
 
 Great Britain
 
 and the
 
 States
 
 General; he was one who was led to ship from a confidence in the King’s Proclamation. We have it in evidence that
 
 Captain Waterburgh
 
 had letters of recommendation both to
 
 Moreson
 
 and a
 
 Mr. Alexander Henderson.
 
 These letters were inclosed to the captain in a letter from
 
 Brantlight & Sons.
 
 It appears, that on the captain’s application to Moreson, nothing could be done without
 
 Henderson;
 

 Moreson
 
 and
 
 Henderson
 
 were the persons who were consulted, and the first who moved to provide a loading for the ship. It appears from the Bills of Lading, that
 
 Henderson
 
 Was a principal shipper. There circumstances considered, the supposition which was made by the counsel for the claimants, is not altogether without foundation, that
 
 Kender Mason,
 
 was by mistake inserted for
 
 Henderson.
 

 But be the fact as it may, we must determine according to the weight of evidence. The Bills of Lading shew, that
 
 Kender Mason
 
 had no property on board; for every, bill mentions the person to whom the
 
 property
 
 belongs, and each bill has a deposition annexed to it, proving the property mentioned to be the property of the persons mentioned, and it appears that these was no other property than what was mentioned in the Bills of Lading, and no where in those Bills is the name of
 
 Kender Mason
 
 to be found. To say then that
 
 Kender Mason
 
 had property on board, is to say that upwards of twenty persons have committed perjury, for there is that number of Bills of Lading and depositions: A mere assertion in a letter can never be suffered to weigh down such a powerful combination of positive proof on oath.
 

 Having now considered all the grounds, on which it was objected that the cargo was, in this case, not protected by the articles of capitulation—we are of opinion that this cargo was protected by the articles against all
 
 French
 
 and
 
 Britijh
 
 captures ; and, if
 
 America
 
 is bound by the articles,, protected also from
 
 American
 
 captures. But the question is, whether the articles of capitulation bind
 
 America? Vattel,
 
 a celebrated writer on the laws of nations, says,
 
 "
 
 when two nations make war a common cause, they act as one body, and the war is called a society of war; they are so clearly and intimately connected, that the
 
 Fus Postliminii
 
 takes place among them, as among fellow subjects.” It appears from the established form of Ransom Bills, that a compact of that nature binds the ally, and it appears by the Passport granted by the
 
 French
 
 Governor, of
 
 Dominica,
 
 that he considers the capitulation as obligatory upon America; for he requires all commanders of
 
 French
 
 vessels, and all commanders
 
 *16
 
 of Spanish
 
 vessels,
 
 and
 
 American
 
 vessels, the allies of France, not to impede the navigation of said ship, in her passage to
 
 Amsterdam;
 
 for that the shippers of the cargo were capitulants, under the protection of the
 
 French
 
 crown. From the very nature of the connection between allies, their compacts and agreements with the common enemy must bind each other, when they tend to accomplish the objects of the allies. Both nations have one common interest and one common object. If such agreements, when correspondent to the terms upon which the alliance is formed and calculated for the attainment of the views and designs which gave birth to it, do not bind the ally, then the consequence would be, that the ally would reap all the fruit and advantages of the compact without being subject to the terms and conditions of it; while the enemy with whom the compact is made, is exposed, with regard to the ally, to all the disadvantages of it, without participating of all the benefits stipulated; an inequality of obligation reprobated by every principle of reason and justice.
 

 If
 
 America
 
 is not bound by the capitulation, then it can give no security to the capitulants, nor can they with safety exercise the rights and privileges of trade conceded to them.
 
 America
 
 being in alliance with
 
 France,
 
 the ports of
 
 France
 
 are opened to our armed vessels; and an
 
 American
 
 privateer might post herself in the ports of
 
 Dominica,
 
 watch the sailing of the ships from that port, pursue and capture them. Under such circumstances thtrade and commerce of the Island would be totally annihilated. But not only the capitulants would suffer;
 
 France
 
 would equally suffer; for, if exportation ceases; the commercial revenue of the Island must cease with it.
 

 The conquest of
 
 Dominica
 
 was productive of great advantages to the common cause. It was a considerable reduction of the power and resources of
 
 Great Britain
 
 ; it placed a great body of her subjects in a state of neutrality; it lessened the commerce and revenues of her government, and eventually deprives her of a part of her dominions.
 

 But if
 
 America
 
 is not bound by the capitulation, neither can the capitulants be bound with regard to America; for no engagement can be a valid one, which ties up the hands of one party, and leaves the other party at full liberty to exercise, on the party bound, all the rights of war.
 

 Then, what should we think of the
 
 French
 
 Governor of
 
 Dominica,
 
 were he to suffer the capitulants to fit out armed vessels, to cruize against
 
 America.
 
 But it is said, that the capitulation, so far as it is contended to bind America, is unequal; for
 
 American
 
 property exported from
 
 Dominica
 
 would be liable to
 
 British
 
 capture, which
 
 British
 
 property would not.
 

 
 *17
 
 This argument is not a fair one; it blends together what ought to be distinguished; a difference ought to be observed between the property of
 
 British subjects
 
 and
 
 British
 
 capitulants.
 
 British
 
 subjects, not capitulants, may rightfully
 
 capture American
 
 property:
 
 Americans
 
 may rightfully capture their property; but
 
 British
 
 capitulants cannot capture
 
 American
 
 property; and therefore it is a perfect equality, that
 
 Americans
 
 shall not capture the property of capitulants.
 

 But it is thought strange, that while
 
 French, Spanish, American
 
 and
 
 British
 
 property should be liable to capture, the property of the capitulants should be exempted from it.
 

 Let us advert for a moment to the peculiar situation of those capitulants. They are a conquered people and reduced to the government of France; they are by compact a neutral body; they have neither the power of war, nor peace ; they commit hostilities against no nation; neither against France, nor
 
 Spain,
 
 nor America, nor
 
 Britain
 
 ; where then is the strangeness in the doctrine, that the property of a people thus reduced, thus defenceless, and thus acting in the line of neutrality, should be protected from capture?
 

 But the resolutions of Congress, with regard to
 
 Bermudas
 
 and other Islands, have been objected, and it is said that
 
 Count d’ Estaing
 
 captured the vessels belonging to those Islands, though, by the resolve of Congress, they we re exempted from capture; which, it is contended, shews that the agreement of one ally does not bind the other. The resolutions of Congress cannot be considered as a compact with the people of
 
 Bermudas
 
 and the other Islands; for those people were not in a capacity to make a compact; they were under subjection to the
 
 British
 
 Crown, and had no authority from the Crown to enter into engagements with
 
 America.
 
 The resolutions therefore of Congress were a mere voluntary suspension of the rights of war, with regard to those people, the continuance of which was perfectly optional with
 
 America.
 

 If
 
 France was
 
 bound by these resolutions of
 
 Congress,
 
 the would only be bound in the extent that
 
 America
 
 was.
 
 America
 
 might say when the pleased, that those resolutions should not exist, and so might France.
 

 But if
 
 France
 
 was bound to a neutrality with regard to
 
 Bermudas
 
 and thofe other Iflands ; then
 
 Bermudas
 
 and thofe other Iflands were bound to a neutrality with regard to
 
 France
 
 : But thofe Iflands were not bound, therefore
 
 France
 
 was not bound ; and
 
 Count d’EJlaing
 
 was well juftified in the captures he made.
 

 With regard then to the question
 
 ,“
 
 whether the articles of
 
 "
 
 capitulation bind
 
 America,”
 
 we are of opinion that they do.
 

 
 *18
 
 But the claimants take a ground which they say will save the cargo at all events and this ground is the ordinance of
 
 Congress,
 
 which relates to the rights of neutrality.
 

 Congress, October 1786, taking into consideration the declaration of her
 
 Imperial Majesty
 
 of
 
 Russia,
 
 with regard to the rights of neutrality, adopt the principles of the declaration, and appoint a committee to report resolutions conformable to them. Resolutions are reported, and on the 7th of April 1781, before the capture in the present case, Congress pass an ordinance ascertaining a set of instructions for commanders of armed vessels, the 3d. and 4th of which areas follow:
 

 3d. "You shall permit all neutral vessels freely to navigation
 
 "
 
 the high seas or coast of America, except such as are employ-“ed in carrying contraband goods, or soldiers, to the enemies
 
 "of
 
 these
 
 United
 
 States.”
 

 4th. “You shall not seize or capture effects belonging to "the subjects of the belligerent powers on board of neutral of "vessels, excepting contraband goods. &c.”
 

 Great Britain, be
 
 fore the capture, had commenced hostilities against the States General; but by proclamation exempted from capture, for a limited time, all ships and vessels, belonging to the States General of the United Provinces, carrying the produce or manufactures of
 
 Dominica,
 
 according to the articles of capitulation. The ship in this case was the property of
 
 Brantlight and Son,
 
 subjects of the States General, carrying the produce of
 
 Dominica
 
 according to the capitulation. She was captured by a
 
 British
 
 privateer, within the limited time; and on a supposition that
 
 America
 
 is not bound by the articles of capitulation; her cargo was the property of
 
 British
 
 subjects at war with
 
 America.
 
 This case comes expressly within the fourth instruction; the ship is certainly within the predicament of neutral property, and the cargo is the property of subject of a belligerent power.
 

 But, it is said, that the rights of neutrality were broken by the
 
 British
 
 capture.
 

 The
 
 British
 
 capture was illegal; it was without authority from the
 
 British
 
 Crown. It was directly against the articles of capitulation, and in opposition to the
 
 British
 
 proclamation; it was a piratical act, in legal strictness, and only excusable on the circumstances of the case. But shall
 
 America
 
 violate rights of neutrality, because another nation has done it? Or, which is the present case, because a subject, without authority from his nation, has done it? Did the ship cease to be a neutral ship by the capture, and did the cargo cease to be
 
 British
 
 property? If not; then, at the time of the recapture, the ship was a neutral ship, and the cargo, effects belonging to the subjects of a belligerent power, and so expressly within the 4th instruction. But it is objected, “that Gr
 
 eat Britain
 
 has not acceded to the rights of
 
 *19
 
 neutrality, and therefore the property on board a neutral vessel ought not to be protected."
 

 The ordinance of Congress makes no exception of
 
 Great Britain
 
 ; for it says, you shall not seize or capture effects belonging to the belligerent powers on board of neutral vessels.
 
 Great Britain
 
 is here beyond a doubt comprehended; for the was a belligerent power when the ordinance passed.
 

 But it is said this ordinance of Congress is obligatory only on commanders of Vessels, but not in the Courts of Admiralty anAppeal. We cannot think that this objection was seriously made.
 

 Upon the whole, we are of opinion that the decree below with regard to the ship, be confirmed; and with regard to the cargo, that it be reversed, and the cargo be charged with the stipulated freight.