61 F.3d 899
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
K.A. BENNETT; C.K. Houchins; R.W. Proffitt; B.E.
Williams; Roy A. Akers; Richard Arvin; Joe W. Bailey;
William S. Baldwin; James W. Billiter; Donald W.
Blackwell; Ronald S. Blankenship; Elbert H. Bolen, Jr.;
R.T. Bowen, III; Jerry Bradley; Chris W. Bragg; Michael
L. Bratton; Mark Breedlove; James E. Broyles; William A.
Carrington; Jerry Cockran; Darryl L. Compton; Steve
Davis; Steve Duncan; Tommy Duncan; Henry L. Dunn; Earl
H. Dye; David R. EArnest; James T. Etter, Jr.; John Fine;
James W. Fulp; Robert Fulp; George Graham; Bobby W.
Gross; Fred Hogan; Donnie R. Harry; Lester Hawkins, Sr.;
Charles Henson; Danny E. Howell; Harold V. Howerton; Carl
Janutolo; Cloyd D. Jefferies; Beck Justus; Alvin D.
Marchant; James M. May; C.E. Melvin, Jr.; L.G. Miller;
Frank Mitchell; Jody R. Neal; Robert J. Neal; Jerry Oney;
Fred O. Pannell, Jr.; Melvin Pannel; R.V. Parham; James
E. Perry; John T. Perry; Jerry Pocrnich; Eugne H. Poole;
Michael S. Quesenberry; William B. Roberts; Dale
Robertson; Robert D. Rotenberry; Charles T. Rorrer;
Douglas Rozzel, Jr.; Barry N. Sample; Emmett W. Sanders;
P.D. Saunders; T.J. Simmons; R.W. Simmons; Perry C.
Simpson; Billy J. Smith; Jerry W. Smith; P.B. Smith;
Roger L. Smith; Roger L. Spence; Bobby E. Tabor, Jr.;
Carl E. Tabor; Robert C. Tabor, Sr.; A.A. Thomason;
Jerome D. Travers; Orrien K. Trigg, Jr.; L.B. Barney;
James M. Wade; Thomas Wallace; James L. Washington; Aaron
Wiley; Aubrey W. Workman, Jr.; Jimmy Woody; Albert J.
Copeland, Jr.; Billy G. Duncan; Danny B. Hale; Hubert J.
Horn; Freddy Howell; James E. Hyder; Henry T. Matthews;
Dempsey W. Mills; Raymond C. Mulkey; William R. Salyer;
Larry J. Sarver; Tommy E. Sisk; Roger S. Hale; Samuel W.
Randolph; Diamond C. Tabor; Kenneth Vance; David B.
Varney; Gary D. Blevins; Larry S. Breedlove; Douglas M.
Doss; David L. Harris; Mack L. Hess; Harold E. Horton;
Mark A. Howell; Jack L. Kipfinger; Norman C. Mabe; James
W. Painter; B.J. Pennington; Raymond E. Poole; Kenneth L.
Richmond; Elvie R. Weatherly; William F. Yost, Plaintiffs-Appellants,
and
W.J. WRIGHT; James M. Addair; Billy W. Gare; Mack A. Law;
Randall L. Miller; Kenneth J. Mulkey; Michael R. Mulkey;
Booker Thomas, Jr.; Curtis Wilson; C.S. Davidson; James
N. Lucas, Sr.; Jack L. Sarver; Isaac L. Wilson; John W.
Asbury; William R. Hall; Charles R. Johnson; Albert L.
Copeland, Sr., Plaintiffs,
v.
NORFOLK & WESTERN RAILWAY COMPANY, a Virginia corporation
doing business in West Virginia; United Transportation
Union; B.G. Gates, individually and as a General Chairman
of the United Transportation Union; L.P. King, Jr.,
individually and as a General Chairman of the United
Transportation Union; G. Thomas DuBose, as International
President, United Transportation Union; Thomas J. McGuire,
as International General Secretary and Treasurer; J.E.
Harden, Jr., as Vice President, United Transportation Union,
Defendants-Appellees.
 No. 94-1728.
 United States Court of Appeals, Fourth Circuit.
 Argued March 9, 1995.
Decided July 31, 1995.
 
 ARGUED: Stephen D. Paesani, Princeton, WV, for Appellants. Norton N. Newborn, NORTON N. NEWBORN CO., L.P.A., Cleveland, OH, for Appellees Union, Gates, King, DuBose, McGuire and Harden; Jeffrey Stephen Berlin, RICHARDSON & BERLIN, Washington, DC, for Appellee N & W Railway. ON BRIEF: Arthur Zachary Schwartz, LEWIS, GREENWALD, KENNEDY, LEWIS, CLIFTON & SCHWARTZ, P.C., New York, NY, for Appellants. Norris Kantor, KATZ, KANTOR & PERKINS, Bluefield, WV, for Appellees Union, Gates, King, DuBose, McGuire and Harden; Mark E. Martin, RICHARDSON & BERLIN, Washington, DC, for Appellee N & W Railway.
 Before WIDENER, MICHAEL, and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 A group of train service employees brought this action against their railroad employer, their union and several union officials, alleging various improprieties in connection with an agreement to reduce the size of railroad crews. The district court granted defendants' motions for summary judgment on all causes of action, and the employees appeal. We affirm the judgment below.
 
 I.
 A.
 
 2
 This case involves train service employees of appellee Norfolk and Western Railway Company (N & W), a large multi-state rail carrier. Train service employees include conductors and brakemen in either road or yard service. Before September 1977 N & W's employees had seniority in either the road or the yard, but not both. Since September 1977, however, they have had both road and yard seniority. Employees who held seniority in the yard prior to September 1977 are known as "prior rights" yardmen; employees who held seniority in the road prior to September 1977 are known as "prior rights" roadmen.
 
 
 3
 Appellee United Transportation Union (UTU) is a labor organization which represents N & W employees in collective bargaining matters. UTU is comprised of many local unions. Appellants are members of UTU Local 655, which serves Bluefield and Williamson, West Virginia, and points in between. Membership in a UTU local corresponds to territory, not to the type of work performed by the members. Local 655's membership therefore includes conductors and brakemen in both road and yard service.
 
 
 4
 UTU is also divided into larger groups called General Committees, which have collective bargaining authority. Unlike the locals, membership in a General Committee is based on the type of work performed within a large territory. Appellees L.P. King and B.G. Gates each chair a General Committee. Their Committees cover a territory known as the "N & W Proper," which extends from Norfolk, Virginia, to the midwest through Virginia, West Virginia, and Ohio, with branches extending north and south into Maryland and North Carolina. King's General Committee is comprised of road conductors on the N & W Proper. Gates's General Committee is comprised of road brakemen and all yardmen on the N & W Proper. Gates and King had jurisdiction over members of various UTU locals, including Local 655.
 
 B.
 
 5
 Train service employees work as crews. A major issue in the railroad business is the size of the train crews, and unions and railroads enter into agreements to deal with this issue. These agreements are known as "crew consist agreements."
 
 
 6
 In 1984 UTU and N & W entered into a crew consist agreement. The 1984 agreement established a system of "productivity funds" for the benefit of those employees hired prior to that agreement, called "protected employees." The funds worked as follows.
 
 
 7
 The N & W territory was divided into eighteen "seniority districts." Each seniority district corresponded to a particular yard or road area, and each seniority district had its own productivity fund. Thus, there were a total of eighteen funds across the N & W territory. Every time a train operated with a reduced crew in a seniority district, N & W contributed $53.25 to that district's fund. Whenever a protected employee performed a "road freight service trip" or a "yard tour of duty," he received a "trip credit." A trip credit was somewhat like a share of stock, entitling its holder to a share of the benefits accumulated in his respective productivity fund(s) for each fiscal year. If a protected employee worked in more than one seniority district, he could collect an annual payment from more than one fund. In short, the productivity funds gave employees an opportunity to share in the financial benefits flowing to N & W from the reduced crews.
 
 
 8
 Local 655 members were eligible to draw from three separate productivity funds, depending on where they worked. Appellants worked in two seniority districts and therefore could draw from two funds: Fund # 11, corresponding to the Bluefield and Williamson yards, and Fund # 12, corresponding to the roads in between and surrounding those yards. Protected employees in Local 655 could collect annual payments from both Fund # 11 and Fund # 12 because, as explained above, train service employees have had seniority in both road and yard service since September 1977.
 
 C.
 
 9
 In September 1991, with the threat of compulsory arbitration lurking in the background, General Committee chairmen King and Gates negotiated with N & W for further crew size reductions. As a result, in October 1991 the parties came up with a proposal for a new crew consist agreement ("1991 agreement" or "principal agreement"). The 1991 agreement included many significant features, for example, the possibility of seniority buy-outs. In addition, because N & W wanted to get rid of the productivity funds, the 1991 agreement included a component called "Side Letter No. 2."
 
 
 10
 Side Letter No. 2 offered protected employees the opportunity to terminate or "sell" their respective productivity funds in exchange for a payment of $60,000 ($20,000 due immediately and $40,000 due upon separation from N & W). Unlike the principal agreement, which would be submitted to an overall ratification vote by UTU membership across the N & W territory, Side Letter No. 2 called for a separate vote on the sale of each of the eighteen funds by the protected members participating in those funds. An employee could get the $60,000 payout from the sale of a fund only if (1) he voted with a majority to sell that fund and (2) the principal agreement as a whole passed. Furthermore, once an employee elected to receive a $60,000 payment from the sale of a fund, he would thereafter no longer be eligible to receive annual payments from any productivity fund. Finally, and most significantly, Side Letter No. 2 said that the $60,000 payout was available only to protected "Conductors and trainmen (foremen/ yardmen) in active service as such on November 1, 1991" (the "in active service requirement"). As discussed below, N & W ultimately took a narrow view of this provision: N & W interpreted it to mean not only that an employee had to have been marked up for work on November 1, but also marked up in a seniority district where a fund sold.
 
 
 11
 At any rate, in late October 1991 chairmen King and Gates travelled around the N & W territory to present the 1991 agreement to the various local unions and to answer questions. Each protected employee received a ballot that asked (1) whether he approved the 1991 agreement and (2) whether he wanted to sell his respective productivity fund. Non-protected employees' ballots only included the former question. The voting extended from October 20 through November 20, 1991.
 
 
 12
 On or around November 20, 1991, the ballots were counted. The membership in the N & W Proper territory approved the 1991 crew consist agreement by a vote of 856-521. With respect to the separate local votes on the productivity funds, members voted to sell fourteen of the eighteen funds. It is significant for this case that protected train service employees in Local 655 voted to sell Fund # 11 (yard) but not Fund # 12 (road).[1]
 
 
 13
 In December 1991, when it came time to distribute the first payments pursuant to Side Letter No. 2, N & W narrowly interpreted Side Letter No. 2's "in active service requirement." N & W took the position that, in order to receive the $60,000 payout from the sale of a productivity fund, an employee had to be marked up for active service on November 1, 1991, in the seniority district corresponding to that fund. As a result of N & W's interpretation, those protected members of Local 655 who voted to sell Fund # 11 (yard), but who were marked up for active service on the road on November 1, could not collect the $60,000 payout from the termination of Fund # 11. In effect, the only Local 655 members who could collect the $60,000 payment were the ones who voted to sell Fund # 11 and who were actually marked up in the yard on November 1. According to Gates and King, it was only after the voting period had ended that they learned that N & W would interpret Side Letter No. 2 in this manner.[2]
 
 D.
 
 14
 A majority of Local 655 voted against ratifying the 1991 agreement, so many of them were upset when that agreement passed. In addition, some of the Local 655 members were upset that Fund # 11 had been sold without their benefiting from the sale, most notably the prior rights yardmen who were marked up on the road on November 1, 1991, but who were denied the $60,000 payout. Consequently, over 125 members of Local 655 filed this suit against UTU, chairman King, chairman Gates, several UTU national officers[3] (collectively, the union defendants) and N & W.[4] Their complaint alleged nine causes of action.[5] The thrust of their complaint was that the defendants breached duties and violated members' rights in connection with the vote to ratify the principal 1991 agreement. For example, the complaint alleged that King and Gates misinformed members on key aspects of the 1991 agreement and in other ways improperly influenced the vote on that agreement. For relief, plaintiffs asked, among other things, that the 1991 agreement be declared null and void pending a new vote.
 
 
 15
 While the complaint focused largely, indeed almost exclusively, on alleged improprieties in connection with the at-large vote to ratify the 1991 agreement, the complaint can fairly be read to have raised a distinct challenge to the separate vote on Fund # 11. Here, the complaint focused on the late October meetings where King and Gates explained the proposed 1991 agreement and answered questions. The complaint alleged that King and Gates "[i]nduced UTU members to vote in favor of elimination of the productivity funds by publicly stating erroneous and incomplete information." JA 121 17(c). As for N & W, the complaint alleged:
 
 
 16
 Despite N & W's knowledge that Gates and King had failed to properly advise the UTU members that in order to be qualified to take a lump sum buy-out employees needed to be "marked-up" in the appropriate unit before November 1, 1991, it failed to so notify employees so affected and relied upon the failure of employees to "mark-up" to deprive said employees, including plaintiffs, of benefits to which they otherwise would have been entitled to.
 
 
 17
 JA 124 27.
 
 
 18
 After a fairly contentious discovery period the union defendants moved for summary judgment on all causes of action. In the face of that motion the plaintiff employees abandoned three of their nine causes. The district court granted the motion as to all other causes. The court also granted N & W's separate motion for summary judgment because the claims against N & W were derivative of the claims against the union defendants.
 
 
 19
 The plaintiff employees appeal the district court's summary judgment ruling, but only with respect to three of the original nine causes of action. Moreover, they have abandoned on appeal certain claims originally asserted within these three causes. Set out below are the three causes of action that are the subject of this appeal.
 
 
 20
 The first cause of action is against the union defendants. It alleges a breach of the duty of fair representation. The second cause of action is against N & W for purportedly participating in the alleged unfair representation claimed in the first cause. The second cause is wholly derivative of and dependent on the first cause. The third cause of action is against the union defendants. It alleges a violation of section 101(a)(1) of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. Sec. 411(a)(1), the equal rights provision.[6]
 
 
 21
 In sum, the three causes of action at issue in this appeal concern two general claims: (1) a breach of the duty of fair representation and (2) a violation of the equal rights provision in section 101(a)(1) of the LMRDA. And, significantly, appellants have limited the substance of their appeal to alleged improprieties in connection with the vote to terminate Fund # 11, focusing on whether King and Gates misinformed members with respect to the "in active service requirement" of Side Letter No. 2. Appellants do not take issue with the district court's summary judgment ruling insofar as it rejected their challenge to the ratification of the principal 1991 agreement, their primary challenge below.
 
 II.
 
 22
 Appellants concede that if the union defendants are entitled to summary judgment on the fair representation claim, then (1) N & W is entitled to summary judgment and (2) the union defendants are entitled to summary judgment on the LMRDA claim. Thus, this entire appeal hinges on the whether the union defendants are entitled to summary judgment on the fair representation claim. We begin, then, with the basis for the district court's summary judgment ruling on that claim. Our review of course is de novo. Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir.1988).
 
 
 23
 In its memorandum opinion the district court correctly observed that a union-member plaintiff asserting a breach of the duty of fair representation must show a causal connection between the union's alleged breach and the plaintiff's alleged injuries. The alleged breach here was that during the October 1991 informational meetings, chairmen King and Gates misinformed appellants with respect to Side Letter No. 2's "in active service requirement," thereby causing or inducing appellants to sell Fund # 11. Generally, the alleged injury was the sale of Fund # 11. Thus, to establish causation, appellants had to show that a majority of those voting would not have sold Fund # 11 had members not been misinformed by King and Gates. In this connection the district court concluded that a showing of causation was not supported by the record because there was no evidence that the vote on Fund # 11 would have been different but for the misinformation. Consequently, the court held that the union defendants were entitled to summary judgment on appellants' fair representation claim.
 
 
 24
 Appellants press two arguments in response to the district court's ruling on causation. First, they contend that the record and the legitimate inferences to be drawn from it establish a genuine issue of fact with respect to whether Fund # 11 would have sold but for the alleged misinformation provided by King and Gates. Second, they argue that if the record does not show such a causal nexus, we should remand and allow them to supplement the record accordingly. The crux of this latter argument is that the union defendants' summary judgment motion did not raise the issue of causation in connection with the vote to terminate Fund # 11, and therefore appellants were not on notice and should not be penalized for failing to build a record on this issue. We will address these two arguments in turn.
 
 
 25
 With regard to the record, it does not support the causation element. Appellants have pointed us to no documentation that shows, for example, the total number of members, or even the total number of appellants for that matter, who voted for and against the sale of Fund # 11. The record is silent with respect to the number of appellants who would have voted against the sale of Fund # 11 but for the alleged misinformation, let alone whether their votes would have been sufficient in number to prevent the sale of that fund. We fail to see how a factfinder, without any evidence on this point, could draw a rational inference that Fund # 11 would not have sold but for the alleged misinformation.[7]
 
 
 26
 That brings us to appellants' second contention. At argument appellants acknowledged that they "come before this Court with an incomplete record on" causation. In addition, they acknowledge in their reply brief that the union defendants are "technically correct that Plaintiffs/Appellants did not assert below the existence of a causal nexus between the complained of acts by UTU and the damage ensu ing from the outcome of the vote of termination of Productivity Fund # 11...." Reply Brief at 3. But they urge that it's not their fault because the union defendants did not press the causation issue below. Appellants explain:
 
 
 27
 The lack of a causal nexus relied upon by the District Court in granting [the union defendants] summary judgment for [the] claim[ ] associated with ... the separate vote for Productivity Fund # 11 is a subject which received only slight attention in [the union defendants'] Brief in support of its [summary judgment] motion.... [The union defendants] relied exclusively upon the absence of bad faith, discriminatory or arbitrary conduct to support its contention that it was entitled to summary judgment on the separate vote for termination of Productivity Fund # 11.
 
 
 28
 Id. at 2-3 (citations omitted).
 
 
 29
 But within the causation section of their eighty-six page memorandum in support of their motion for summary judgment on all causes of action, the union defendants clearly asserted this: "Apart from all of the foregoing, there is no basis for finding liability against UTU Defendants either for unfair representation or under the LMRDA claims for the reason that Plaintiffs do not and cannot show a causal nexus between any of the improprieties they allege and any injury to themselves." Memorandum in Support of Motion for Summary Judgment, at 72 (emphases added). Defendants thereby pointed out to the district court that there was an absence of evidence on causation with respect to these claims. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case."); see Cray Communications, Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 393-94 (4th Cir.1994) (noting that "under Celotex, 'the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case' " (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure Sec. 2720, at 10 (2d ed. Supp.1994))), cert. denied, 115 S.Ct. 1254 (1995). Appellants should have been aware that the causation element was in play with respect to the sale of Fund # 11,[8] and they should have responded with evidence of causation. But as appellants euphemistically put it at argument, their opposition memorandum "failed to educate the district court on this issue" in the context of Fund # 11, notwithstanding that it was an essential element of their fair representation claim, an element on which they had the ultimate burden of proof. The Supreme Court counseled in Celotex that
 
 
 30
 the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.
 
 
 31
 Id. at 322-23; see Fed.R.Civ.P. 56(e). Appellants certainly had adequate time for discovery here. Moreover, the information they needed to satisfy the causation element was wholly within their hands; for example, how many of them were misinformed by King and Gates, how many of them voted to sell Fund # 11, how many would have voted differently but for the misinformation, and the overall vote on Fund # 11. Appellants were not "in any sense 'railroaded' by a prema ture motion for summary judgment."[9] Celotex, 477 U.S. at 326; see
 
 
 32
 Cray Communications, 33 F.3d at 394. In the final analysis, summary judgment was appropriate on the fair representation claim. And, con sequently, appellants concede that summary judgment is appropriate on the LMRDA claim.
 
 III.
 
 33
 We affirm the judgment of the district court.
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 The record shows that Fund # 11 was relatively unproductive. For example, Fund # 11 payed out around $3.79 per trick per employee in 1991; in 1992 Fund # 12 payed out $31.70 per trick
 
 
 [2]
 Employees continue to earn trip credits when they work in the Bluefield and Williamson yards. However, those credits now are paid out of Fund # 12, and N & W no longer contributes money to a fund when a train operates with a reduced crew in the Bluefield and Williamson yards. Employees working on the road continue to collect from Fund # 12
 
 
 [3]
 Appellees G. Thomas Dubose, Thomas J. McGuire and J.E. Harden were sued in their official capacities as national officers of UTU
 
 
 [4]
 None of the these employees filed a grievance to challenge N & W's interpretation of Side Letter No. 2 through arbitration
 
 
 [5]
 When we refer to the complaint, we mean the second amended complaint
 
 
 [6]
 This cause originally alleged a violation under 101(a)(2) of the LMRDA as well, but appellants have abandoned that claim on appeal
 
 
 [7]
 It bears emphasizing that appellants have focused this appeal exclusively on the outcome of the vote on Fund # 11; they argue that, but for the alleged misinformation, appellants, particulary prior rights yardmen, would have voted "no" instead of "yes." To that end, we find interesting appellants' statement that, had the prior rights yardmen not been misinformed in late October, they might have "taken steps to insure their placement in active yard service" on November 1. Reply Brief at 11. In other words, they might have voted "yes" on the sale of Fund # 11 and tried to mark up in the yard. This, we think, demonstrates that, contrary to appellants' suggestions, one could only speculate from the record that a majority of voting members would have voted "no" had they been correctly informed on N & W's interpretation of Side Letter No. 2
 
 
 [8]
 To be sure, the union defendants' causation section focused on the lack of causation in connection with the at-large vote to ratify the principal agreement. But because the union defendants asserted that the record did not show a causal nexus between any of the alleged improprieties and any injuries suffered, appellants were put on notice that causation was at issue with respect to all aspects of their fair representation claim. Cf. Cray Communications, 33 F.3d at 393 (rejecting nonmovant's argument that movant "was required to support its summary judgment motion with evidence tending to negate [nonmovant's] claim"); Windon Third Oil & Gas Drilling Partnership v. FDIC, 805 F.2d 342, 345 (10th Cir.1986) (when there is no evidence in the record, "[t]he moving party's burden cannot be enhanced to require his proof of a negative"), cert. denied, 480 U.S. 947 (1987)
 
 
 [9]
 It may very well be that many of the individual plaintiffs below were not cooperating in the presentation of this case in the district court. We note, for example, that on December 1, 1992, the union defendants served their first and only set of interrogatories. By the end of January 1993, only four of the plaintiffs (out of over 125) had given their lawyer answers to the interrogatories. Not only were their answers incomplete, they were not served until June 28, 1993. Meanwhile, on April 1, 1993, the union defendants filed a motion to compel answers to the interrogatories. By order dated April 30, 1993, a magistrate judge granted the motion to compel and directed those plaintiffs who had yet to respond to begin "immediately" the production of answers, "at a rate of not less than 25 per week." The plaintiffs failed to comply with the motion to compel: no additional answers were served between April 30 and June 8, 1993. On June 8, 1993, the union defendants moved for sanctions pursuant to Fed.R.Civ.P. 37. After a hearing, the district judge granted the motion, which resulted in a monetary sanction and the dismissal of a number of the plaintiffs from this case