IN THE COURT OF APPEALS

EDWARD J. EYRING, M.D.,  ) KNOX CIRCUIT
                         ) C.A. NO. 03A01-9607-CV-00240
    Plaintiff-Appellant  )
                         )
                         )
                         )
                         )
                         )
vs.                      ) HON. WHEELER A ROSENBALM
                         ) JUDGE
                         )
                         )
                         )
                         )
                         )
FORT SANDERS PARKWEST MEDICAL ) AFFIRMED AND REMANDED
CENTER, INC., and FORT SANDERS )
ALLIANCE, INC.,          )
                         )
    Defendants-Appellees )


JOHN K. KING and ALAN PARKER, Lewis, King, Krieg, Waldrop and Catron, Knoxville  for Appellant.

FOSTER D. ARNETT and RICK POWERS, Arnett, Draper and Hagood, Knoxville, for Appellees.


O P I N I O N


McMurray, J.


We are primarily called upon in this appeal to decide whether the Tennessee Peer Review Law of 1967 (T.C.A. § 63-6-219) (the Law) grants immunity to hospitals for actions taken against physicians

upon recommendations of peer review boards or committees. For reasons hereinafter stated, we believe that the law was intended to, and does, grant hospitals such immunity. We affirm the judgment of the trial court.

The plaintiff/appellant, Edward J. Eyring, M.D., is a licensed physician in the State of Tennessee and a Board Certified Orthopedic Surgeon. He became a member of the medical staff of the defendant/appellee, Fort Sanders Parkwest Medical Center in 1974 (Parkwest).[1] In July 1992, Parkwest terminated his privileges. Dr. Eyring thereafter sued Parkwest alleging breach of contract, intentional interference in contract, intentional interference in an existing business relationship, intentional interference in a prospective business expectancy, and intentional discriminatory interference in his right to engage in his profession at the hospital.

The Circuit Court for Knox County granted the defendants summary judgment, holding that the hospital enjoyed immunity under the immunity provision of the law, had not acted in bad faith nor was motivated by malice, and had not violated its bylaws. Plaintiff appeals, raising the following issues:

> A. Whether the trial court erred in refusing to grant partial summary judgment to Plaintiff/Appellant under Lewisburg Community Hospital v. Alfredson, 805 S.W.2d 756 (Tenn. 1991) on the issue of contract liability based upon Parkwest Hospital's violation of its Bylaws.

---

[1] Parkwest Hospital was purchased by Fort Sanders Alliance in 1990 and became known as Fort Sanders Parkwest Medical Center. We hereafter refer to the hospital as "Parkwest."

2

B. Whether the trial court erred in failing to hold that Defendants/Appellees were not entitled to immunity under the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101. et seq.

C. Whether the trial court erred in granting summary judgment to Defendants/Appellees granting it immunity from monetary liability under the Tennessee Peer Review Law, T.C.A. § 63-6-219.

D. Whether the Tennessee Peer Review Law immunity provision, T.C.A. § 63-6-219(c)(1) applies to hospitals.

E. Whether T.C.A. § 63-6-219(c) provides immunity for breach of contract.

F. Whether the trial court's application of the Tennessee Peer Review Law impermissibly interferes with preexisting contract rights.

G. Whether Parkwest failed to meet its burden of proving that its actions fall within the standard of the Peer Review Law.

H. Whether the trial court erred in failing to hold that Parkwest Hospital's actions were not made in good faith but occurred under circumstances from which legal malice should be inferred.

I. Whether the trial court's grant of summary judgment should be reversed because Plaintiff/Appellant was denied an adequate opportunity to engage in discovery.

J. Whether the Peer Review [Law] should be nullified on the basis of the doctrine of equitable estoppel.

K. Whether the revocation of Plaintiff's staff membership should be vacated by the doctrines of Res Judicata and Collateral Estoppel.

Although plaintiff enumerates eleven issues, we are primarily concerned with the applicability of the Tennessee Peer Review Law, therefore, we will discuss the issues relating to it first.

### THE TENNESSEE PEER REVIEW LAW OF 1967

3

T.C.A. § 63-6-219 was enacted in 1967, and is quoted in its entirety as follows:

**T.C.A. § 63-6-219. Legislative policy declaration —Medical review committees — Immunity of members — Confidentiality of records -- Short title.** -- (a)(1) In conjunction with the applicable policies of the Health Care Quality Improvement Act of 1986 (42 U.S.C. §§ 11101-11152), it is the stated policy of Tennessee to encourage committees made up of Tennessee's licensed physicians to candidly, conscientiously, and objectively evaluate and review their peers' professional conduct, competence, and ability to practice medicine. Tennessee further recognizes that confidentiality is essential both to effective functioning of these peer review committees and to continued improvement in the care and treatment of patients.

(2) As incentive for the medical profession to undertake professional review, including the review of health care costs, peer review committees must be protected from liability for their good faith efforts. To this end, peer review committees should be granted certain immunities relating to their actions undertaken as part of their responsibility to review, discipline, and educate the profession. In instances of peer review committees examining the appropriateness of physicians' fees, this immunity must also extend to restraint of trade claims under title 47, chapter 25.

(b) As used in this section, "medical review committee" or "peer review committee" means any committee of a state or local professional association or society, including impaired physician peer review committees, programs, malpractice support groups and their staff personnel, or a committee of any licensed health care institution, or the medical staff thereof, or any committee of a medical care foundation or health maintenance organization, preferred provider organization, individual practice association or similar entity, the function of which, or one (1) of the functions of which, is to evaluate and improve the quality of health care rendered by providers of health care service to improve the quality of health care rendered by providers of health care service to provide intervention, support, or rehabilitative referrals or services, or to determine that health care services rendered were professionally indicated, or were performed in compliance with the applicable standard of care, or that the cost of health care rendered was considered reasonable by the providers of professional health care services in the area and includes a committee functioning as a utilization review committee under the provisions of Public Law 89-97 (42 U.S.C. §§ 1395-1395pp)(Medicare Law), or as a utilization and quality control peer review organization under the provisions of the Peer Review Improvement Act of 1982, Public Law 97-248, §§ 141-150, or a similar committee or a committee of similar purpose, to evaluate or review the

4

diagnosis or treatment or the performance or rendition of medical or hospital services which are performed under public medical programs of either state or federal design.

(c)(1) All state and local professional associations and societies and other organizations, institutions, foundations, entities and associated committees as identified in subsection (b), physicians, surgeons, registered nurses, hospital administrators and employees, members of boards of directors or trustees of any publicly supported or privately supported hospital or other such provider of health care, any person acting as a staff member of a medical review committee, any person under a contract or other formal agreement with a medical review committee, any person who participates with or assists a medical review committee with respect to its functions, or any other individual appointed to any committee, as such term is described in subsection (b), is immune from liability to any patient, individual or organization for furnishing information, data, reports or records to any such committee or for damages resulting from any decision, opinions, actions and proceedings rendered, entered or acted upon by such committees undertaken or performed within the scope or function of the duties of such committees, if made or taken in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist.

(2) Notwithstanding the provisions of subdivision (c)(1), any person providing information, whether as a witness or otherwise, to a medical review committee regarding the competence or professional conduct of a physician is immune from liability to any person, unless such information is false and the person providing it had actual knowledge of such falsity.

(3) A member of a medical review committee, or person reporting information to a medical review committee, is presumed to have acted in good faith and without malice. Any person alleging lack of good faith has the burden of proving bad faith and malice.

(d) All information, interviews, incident or other reports, statements, memoranda or other data furnished to any committee as defined in this section, and any findings, conclusions or recommendations resulting from the proceedings of such committee are declared to be privileged. All such information, in any form whatsoever, so furnished to, or generated by, a medical review committee shall be privileged communication subject to the laws pertaining to the attorney-client privilege. The records and proceedings of any such committees are confidential and shall be used by such committee, and the members thereof only in the exercise of the proper functions of the committee, and shall not be public records nor be available for court subpoena or for discovery proceedings. One (1) proper function of such committees shall include advocacy for physicians before other medical peer review committees, peer review organizations, health care entities, private and governmental insurance

5

carriers, national or local accreditation bodies, and the state board of medical examiners of this or any other state. The disclosure of confidential, privileged peer review committee information to such entities during advocacy, or as a report to the board of medical examiners under § 63-6-214(d), or to the affected physician under review does not constitute either a waiver of confidentiality or privilege. Nothing contained herein applies to records made in the regular course of business by a hospital or other provider of health care and information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any civil proceedings merely because they were presented during discovery proceedings of such committee.

(e) This section shall be known and may be cited as the "Tennessee Peer Review Law of 1967." [Acts 1967, ch. 348, § 1; 1975, ch. 117, § 63-623; Acts 1983, ch. 344, §§ 1, 2; 1987 ch. 315, § 1; 1988 ch. 609, §§ 1,2; 1990, ch. 596, § 1; 1992, ch. 916, § 1; 1992, ch 916, §§ 1-47; 1993, ch. 404, § 13; 1994, ch. 732, §§ 5,6.]

The Trial Court found that the law applied to Parkwest, stating:

And so it appears to the Court, as already indicated, that so long as the committees and health care providers who make decisions about peer review are free of bad faith and malice, and there are facts which are reasonably known or reasonably believed to exist, that the health care providers making decisions about peer review should be free from the interference and control of Courts.

The court further found that Parkwest's peer review committee concluded that the plaintiff was too aggressive in the practice of orthopedic surgery, and exercised poor clinical judgment in selecting patients for surgery. The court found that the plaintiff had failed to produce sufficient evidence to create a genuine issue of material fact that the hospital was not acting in good faith or was motivated by malice in making its decision to revoke plaintiff's privileges.

6

Before addressing plaintiff's issues relating to the peer review statute, we note that our standard of review in considering the propriety of summary judgment is as follows:

> The standards governing an appellate court's review of a trial court's action on a motion for summary judgment are well settled. Since our inquiry involves purely a question of law, no presumption of correctness attaches to the trial court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tenn. R. Civ. P. 56 have been met. Cowden v. Sovran Bank/Central South, 816 S.W.2d 741, 744 (Tenn. 1991). Tenn. R. Civ. P. 56.03 provides that summary judgment is only appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993); and (2) the moving party is entitled to a judgment as a mater of law on the undisputed facts. Anderson v. Standard Register Co., 857 S.W.2d 555, 559 (Tenn. 1993). The moving party has the burden of proving that its motion satisfies these requirements. Downen v. Allstate Ins. Co., 811 S.W.2d 523, 524 (Tenn. 1991).
>
> The standards governing the assessment of evidence in the summary judgment context are also well established. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. Byrd, 847 S.W.2d at 210-11. Courts should grant a summary judgment only when both the facts and the conclusions to be drawn from the facts permit a reasonable person to reach only one conclusion. Id.

Carvell v. Bottoms, 900 S.W.2d 23 (Tenn. 1995).

Plaintiff argues that Parkwest was not entitled to summary judgment under the Peer Review Law for a myriad of reasons. We shall first address the question of whether the law applies to hospitals. Plaintiff claims that the plain language of the statute does not include hospitals, and that including hospitals would be in derogation of the intent of the statute. See Madison Loan & Thrift Co. v. Neff, 648 S.W.2d 655, 657 (Tenn. App. 1982) ("It is a general

7

rule that no intent may be imputed to the legislature in the enactment of a statute other than such as is supported by the face of the statute itself.") Applying this rule of construction, plaintiff argues that since the term "hospital" does not appear anywhere within the statute's immunity provision, it is improper to imply that hospitals were intended by the legislature to be included.

Parkwest counters with the argument that the language of the statute includes hospitals. Specifically, Parkwest cites two sections that, in its opinion, include hospitals. T.C.A. § 63-6-219(b) defines a medical review committee or peer review committee to include "a committee of any licensed health care institution." Clearly, this would include the peer review committees of Parkwest which investigated the plaintiff. Parkwest then directs our attention to section (c)(1) of the law, which grants immunity to "[a]ll state and local professional associations and societies and other organizations, <u>institutions</u>, foundations, and <u>entities</u> and associated committees as identified in subsection (b) . . . "[2] (emphasis added). Parkwest notes that a hospital is defined as an institution under T.C.A. § 68-11-201(21)(A).[3]

We have thoroughly reviewed the Peer Review Law, and concur with the trial court's conclusion that the immunity granted does

---

[2]As discussed below, this section only grants immunity when such actions are taken in good faith and without malice.

[3]"'Hospital' means any institution, place, building or agency represented and held out to the general public as ready, willing and able to furnish care, accommodations, facilities and equipment for the use, in connection with the services of a physician or dentist . . . ." T.C.A. § 68-11-201(21)(A).

extend to hospitals. Our decision is based on several factors. First, while clearer language could have been employed, we believe section (c)(1) was meant to include hospitals by the inclusion of the terms "institutions" and "entities." Certainly the legislature was aware of its use of the term institution as referring to a hospital in T.C.A. § 68-11-201(21)(A). However, even more persuasive is the language of section (b) of the Peer Review Law. That section defines a peer review or medical review committee as a committee of a licensed health care "institution." Section (c)(1) clearly grants immunity to all "institutions" as identified in subsection (b), which identifies committees of various medical groups. The only use of the word institution in subsection (b) is in reference to "licensed health care institutions," which, as previously stated, has been defined by the legislature to mean a hospital.

Second, we believe it would be contrary to the intent of the legislature to grant immunity to medical/peer review committees, but not to the organizations that act upon their recommendations. Plaintiff argues that section (c)(1) only includes the committees of such groups. However, the language of the section specifically identifies various medical providers, and associated committees. We believe this language grants immunity to the peer review committees, and the entities from which such committees are formed. The Peer Review Law is intended to be an incentive for the medical profession to "undertake professional review." T.C.A. § 63-6-219(2). As part of that review, the Law makes it the responsibility of the committee to "review, discipline, and educate the profession." Id. (emphasis

9

added).  The law is silent, however, as to the various means such committees are to use in those efforts. Since such committees are charged with disciplining physicians, and granted immunity for those acts, it would seem illogical to grant immunity to a committee that makes a recommendation for discipline, but not to the hospital for carrying out such recommendation. Here Parkwest charged its review committees with investigating and recommending appropriate action against the plaintiff. Parkwest followed the committee's recommendation. We believe that public policy mandates that hospitals be immune from liability for acting upon the recommendation of a peer review committee.  To hold otherwise would thwart what we perceive to be the intention of the legislature. We believe this decision is in keeping with the rule of statutory construction set forth in Madison Loan & Thrift, supra.  We are not imputing an intent to the legislature's actions.  Rather, we are reinforcing the intent set forth by the legislature to encourage the self-discipline of the medical profession.

Finally, as to the applicability of the Peer Review Law, plaintiff maintains that the Law interferes with plaintiff's pre-existing contractual rights, and was not meant to grant immunity for breaches of contract.  As to the alleged interference with preexisting contractual rights, plaintiff maintains that he entered into a written contract with Parkwest in the form of the hospital's bylaws in 1974, and that since there was no lapse in this contractual relationship, the 1990 amendment to the Peer Review Law that we have determined granted immunity to hospitals impermissibly interferes with his contractual relationship.  We disagree.  We do

10

not find that plaintiff had a contractual relationship with Parkwest with no lapses since 1974. We find that Dr. Eyring had privileges at Parkwest, with no lapse from 1974 to 1992, but that he had multiple contracts with Parkwest during that period.

Parkwest's bylaws provide for procedures for the reappointment of physicians to its medical staff every two years. We believe, as did the trial court, that each successive reappointment was a separate, distinct contractual relationship for a two-year period, not a continuous contractual relationship as plaintiff asserts. Our decision is supported by the rules of the Board for Licensing Health Care Facilities of the Tennessee Department of Health which prohibit a hospital from appointing a physician to its medical staff for a period of more than two years. Tenn. Admin. Comp. § 1200-8-3-.02(1). If Parkwest's regulations could somehow be construed as guarantying a physician's reappointment, or if the reappointment procedure were construed to be a continuing contractual relationship from the time the plaintiff joined the hospital's staff, both the spirit, letter and intent of the Department of Health's rules would be violated. We therefore hold that the Peer Review Law, as applied to this physician, did not interfere with a preexisting contractual relationship. Having reached this conclusion and concluding that plaintiff has failed to show a violation of Parkwest's bylaws, which we will hereinafter discuss, we need not reach plaintiff's contention that the law was not meant to provide immunity for a breach of contract.

11

## MALICE

As we have stated, the immunity granted by the Peer Review Law is a qualified one. Only actions that are taken in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist are immune. T.C.A. § 63-6-219(c)(1). A 1994 amendment to the law provided that "A member of a medical review committee, or person reporting information to a medical review committee, is presumed to have acted in good faith and without malice. Any person alleging lack of good faith has the burden of proving bad faith and malice." T.C.A. § 63-6-219(c)(3). This amendment clearly places the burden on the party alleging bad faith to prove such action. However, plaintiff maintains that this provision only places the burden on the complaining party if it is alleging bad faith on the part of the committee, not on the part of the hospital. Therefore, since he sued the hospital and not the individual members of the Parkwest committees who recommended revocation of his privileges, he does not bear this burden. We respectfully disagree.

Subsequent to our Supreme Court's decision in 1993 that after full discovery a physician had failed to create a genuine issue that a medical review committee had acted in bad faith and with malice, the legislature amended the Peer Review Law to create the presumption of good faith.[4] Clearly, the language of that amendment applies to members of medical review committees and those people

_____

[4]Alexander v. Memphis Individual Practice Ass'n, 870 S.W.2d 278 (Tenn. 1993).

12

reporting information to such committees. However, as we have stated, we believe the statute applies to hospitals when acting on the recommendation of medical review committees. The statute, when read in toto, provides immunity for the discipline of physicians upon the evaluation and recommendation of medical review committees. We are persuaded that to disallow immunity to the hospital would have a chilling effect upon the ability of hospitals to evaluate, discipline or withdraw privileges from physicians practicing in their facility. Stated differently, the spirit and intent of the Law would be rendered ineffective if hospitals were not granted immunity. While the plaintiff is not suing the individual members of the medical review committees of Parkwest, but is suing the hospital directly, we believe that the law nevertheless applies because plaintiff's bases for suing the hospital spring directly from the actions and recommendations of the review committees. We therefore believe that such presumption of good faith as provided for by T.C.A. § 63-6-219(c)(3) remains in effect. The language of the amendment does not state that it applies only when members of peer review committees are sued, nor should it, given public policy reasons. The statute, as we have stated, applies to entities acting upon the recommendation of such committees. There is, therefore, no need to expressly attach a presumption of good faith to the hospital statutorily. It is the action of the committee, not the action of the hospital in relying on the committee, where the presumption is most compelling.

13

Having reached the above conclusion, we will now discuss whether plaintiff demonstrated by sufficient countervailing evidence to establish a genuine issue of fact concerning the allegations that Parkwest's actions were not made in good faith and occurred in circumstances from which legal malice should be inferred. Plaintiff cites a law review article discussing "appropriate factors upon which malice may be implied or inferred" in the peer review process.[5] Plaintiff cites seven factors from the article that indicate, in his opinion, that legal malice should be inferred. Those seven factors are:

1. Malice may be inferred when the complaint originates and is pursued outside the normal quality assurance procedure.

2. Malice may be inferred when stale charges are used.

3. Malice may be inferred by the manner in which the administration handled the initial complaints -- was the doctor considered competent until proven incompetent; or was he summarily terminated from the medical staff.

4. Lack of due process is a circumstance from which legal malice may be inferred.

5. Malice should be implied when a physician did not have an opportunity to be meaningfully heard in response to the allegations.

6. Malice may be inferred by the disparate treatment of one doctor as compared to the doctor's colleagues.

7. Malice may be inferred when the severity of the hospital disciplinary action is disproportionate.

---

[5]P. Rosen, Medical Staff Peer Review: Qualifying the Qualified Privilege Provision, 27 Loyola L. Rev. 357 (1993).

14

We have thoroughly reviewed plaintiff's argument and the record, and conclude that there was insufficient evidence from which malice could have been inferred under the Peer Review Law. We also note that the conditions set out in the law review article have not been established. As we have previously stated, the burden of proof for demonstrating malice rests on the plaintiff because of the presumption of good faith embodied in the statute. In order to overcome the presumption of good faith of T.C.A. § 63-6-219(c)(3), we believe that a plaintiff must produce more than the conclusory evidence that the plaintiff has submitted in opposition to the hospital's motion for summary judgment. The Tennessee Peer Review Law not only provides immunity for actions taken in good faith by peer review groups, it imposes extremely stringent safeguards in limiting discovery and in requiring physicians to overcome a strong presumption of good faith on the part of review groups. It is not the province of this court to second guess the wisdom of the legislature in enacting these restrictions. We cannot, however, escape the conclusion that the legislature intended to afford peer review groups the utmost discretion in reviewing the medical profession, and in limiting the ability to question that review. Indeed, because of the importance of quality review of the medical profession, and the unique problems associated with review of medical competence by non-physicians, we believe the legislature enacted this statute to insure that such peer review would be free from judicial intervention absent clear proof of an egregious injustice during the process. Plaintiff has not demonstrated such conduct in his countervailing evidence, and the trial court was correct in refusing to infer legal malice.

15

Having reached this conclusion, we believe that the burden of proving malice, on motion for summary judgment, requires such evidence, accepted as true, to show that more probably then not, the committee acted maliciously. We are not prepared to discuss any type of "minimal requirements" that might suffice. The inquiry must necessarily be made on a case by case basis. In this case specifically, we note that the plaintiff was present at the revocation hearing of the Parkwest Board of Directors, and was allowed to present proof on his behalf. Certainly, the statute allows for plaintiff to testify to inaccuracies that were presented to the Board. However, plaintiff has failed to adequately do so in this case. Plaintiff admits that his practice of medicine was somewhat controversial, that he has an "aggressive" approach to surgery, and that he is "willing to attempt the difficult surgical cases that other surgeons often refused to treat." This admission is essentially the same as the lower court's finding that Parkwest based its decision on the determination that plaintiff was too aggressive in the practice of medicine, and had used poor judgment in selecting patients for surgery. Plaintiff is essentially asking the courts to retry the Parkwest hearing, something that we, as non-physicians, lack the capability to do. We must limit our inquiry to the lawfulness of the procedure employed by Parkwest.

## HEALTH CARE QUALITY IMPROVEMENT ACT

The plaintiff also contends that Parkwest was not entitled to immunity under the Health Care Quality Improvement Act (HCQIA) of

16

1986, codified at 42 U.S.C. §§ 11101, et seq. The Trial Court concluded that the Peer Review Law applied instead of the HCQIA.

Plaintiff contends that the trial court was in error by applying the Peer Review Law instead of the HCQIA. Plaintiff argues that Parkwest chose to place itself within the immunity provisions of HCQIA, but did not comply with HCQIA due process requirements in terminating plaintiff's hospital privileges.

Parkwest argued in the lower court that it was immune from suit under both the Tennessee Peer Review Law and the HCQIA. The trial court granted summary judgment to Parkwest based solely on the Peer Review Law. Thus, whether Parkwest was entitled to summary judgment under HCQIA is a moot point. The trial court did not reach this issue and we have concurred with the trial court's decision concerning immunity under the Peer Review Law. We note, parenthetically, however, that HCQIA does not impose specific minimal hearing requirements on peer review committees for which aggrieved physicians can seek redress. See Hancock v. Blue Cross-Blue Shield of Kansas, Inc., 21 F.3d 373, 374 (10th Cir. 1994) ("Congress did not intend to create a cause of action for the benefit of physicians to enforce provisions of the HCQIA.")

## CONTRACTUAL LIABILITY

The Trial Court denied plaintiff's motion for partial summary judgment on the issue of contractual liability. The Tennessee Supreme Court held in Lewisburg Community Hospital v. Alfredson, 805

17

S.W.2d 756 (1991), that a hospital's failure to follow its bylaws is subject to a lawsuit, because the bylaws of a private hospital constitute a contract with a physician on its staff. "Like any other legal entity, hospitals are capable of breaching contracts, committing torts, or violating other's constitutional rights. When they do, they are no less subject to the court's jurisdiction than anyone else." Id. at 759 (citation omitted). Indeed, the Board for Licensing of Health Care Facilities of the Tennessee Department of Health requires all licensed hospitals to adopt bylaws setting forth the due process procedures for depriving a physician of staff membership or clinical privileges. See Tenn. Admin. Comp. § 1200-8-3-.02(2)(a).

With the foregoing in mind, plaintiff argues that the trial court erred in not granting its motion for partial summary judgment on the issue of contractual liability based on Parkwest's violation of its bylaws. Plaintiff sets forth 94 purported violations of its bylaws, which we list in Appendix A to this opinion.

Parkwest does not dispute plaintiff's position that a hospital must follow its bylaws in matters involving the credentials of its physicians. The hospital argues, however, that it, in fact, did substantially follow its bylaws. Parkwest admits that its board did act prematurely on the Medical Executive Committee's adverse recommendation, but that it immediately rescinded such action. Furthermore, Parkwest contends that plaintiff was in no way prejudiced by such action, and that plaintiff in fact made no such allegation.

18

Other than listing the 94 alleged violations set forth in appendix to this opinion (which lack adequate references to the record or indication of how plaintiff was harmed by each violation), plaintiff has utterly failed to identify any reason why summary judgment was not appropriate to this issue. Likewise, he has failed to direct the Court to instances in the record where he was harmed by any specific violation. It is not incumbent upon this Court to sift through the record in order to find proof to substantiate the positions of the parties. See Redbud Coop. Corp. v. Clayton, 700 S.W.2d 551, 557 (Tenn. App. 1985). See also Mabry v. Mabry, an unreported opinion of this Court filed at Knoxville February 14, 1992. (1992 Tenn. App. LEXIS 130). However, in order to do justice and avoid further litigation expense, if possible, we have endeavored to search through the record, which consists of more than 5,000 pages, to determine if there are undisputed facts to entitle the plaintiff to partial summary judgment as a matter of law. We find no evidence sufficient to overcome the trial court's finding that there was not a sufficient departure of Parkwest's bylaws to warrant the granting of partial summary judgment to the plaintiff. The exhaustive list of alleged violations plaintiff presents is replete with repetitive, self-serving allegations not adequately supported by specific references to the bylaws or record. Plaintiff's argument is simply not supported by the record. We affirm the Trial Court's decision that the plaintiff was not entitled to partial summary judgment on the issue of contractual liability.

19

Plaintiff also raises as an issue whether summary judgment should be reversed because he was denied an adequate opportunity to engage in discovery. The trial court first ruled that plaintiff would be entitled to discovery insofar as necessary to enable plaintiff to inquire as to whether Parkwest's actions were made in good faith without malice and upon facts reasonably known or reasonably believed to exist. However, Parkwest's attorneys objected during the discovery process on the basis of privilege and confidentiality in accordance with T.C.A. § 63-6-219(d), which makes information furnished to or generated by a medical review committee privileged, subject to the laws pertaining to the attorney-client privilege. The court then ruled that plaintiff could not engage in discovery in order to probe the actual peer review process. Plaintiff now complains that without such discovery, he was denied access to the "very source of information upon which to substantiate his claim that the process used by Parkwest involved legal malice, and that the decision was not based on facts reasonably known or reasonably believed to exist."

Plaintiff argues that the confidentiality provision of T.C.A. § 63-6-219(d) grants an exception to the confidentiality privilege by the language "subject to the laws pertaining to the attorney-client privilege." Plaintiff then directs us to a recent unreported case from this court, holding that there is "an exception when the activities of counsel are directly at issue." Cannon, et al., v. Garner, opinion filed at Nashville on December 1, 1995. We do not

20

believe that <u>Cannon</u> applies. Contrary to plaintiff's assertion, <u>Cannon</u> did not involve the application of the attorney-client privilege, but was a case involving the work product rule. Although similar, the work product rule is distinct from and broader than the attorney-client privilege. <u>See</u> <u>Hickman v. Taylor</u>, 329 U.S. 495, 508, 67 S. Ct. 385, <u>United States v. Nobles</u>, 422 U.S. 225, 238, 95 S. Ct. 2160, 2169-70. The work product rule, found in Rule 26.02(3), T.R.C.P., provides for discovery upon a showing that the party seeking discovery has a "substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." The attorney-client privilege on the other hand, is considered to be the privilege worthy of the greatest protection. Neil P. Cohen, Donald F. Paine & Sarah Y. Sheppeard, <u>Tennessee Law of Evidence</u>, § 501.4 (2d ed., 1990). Communications between a client and an attorney are privileged. T.C.A. § 23-3-105. Unlike the work product rule, no exception applies for discovering information without undue hardship. Given this important distinction, plaintiff's argument that he was unable to discover information about the peer review process without undue hardship must fail. We hold that the trial court was correct in denying plaintiff the ability to conduct discovery concerning the peer review process.

## EQUITABLE ESTOPPEL

The Plaintiff next argues that Parkwest should have been precluded from revoking plaintiff's privileges due to the doctrine

21

of equitable estoppel. Basically, plaintiff claims that Parkwest should not have been allowed to revoke plaintiff's privileges because it had reappointed him to the medical staff in 1991 without any restrictions. Plaintiff claims that he detrimentally relied on his reappointment without restrictions and was irreparably harmed and damaged as a result of Parkwest's subsequent change of position. Plaintiff maintains that Parkwest's decision to revoke his privileges was based on 23 of plaintiff's patient's charts, which were known to Parkwest at the time of his reappointment. We find this position to be without merit.

The doctrine of equitable estoppel is an equitable remedy that is designed to prevent inconsistency and fraud from resulting in an injury. When a person has been mislead by the untruth propounded by another, and acted to his detriment in reliance upon the misrepresentation, the misleading party will be estopped to show that the true facts are contrary to those he first propounded. Arthur v. Lake Tanasi Village, Inc., 590 S.W.2d 923 (Tenn. 1979), Corim, Inc. v. Sam Blair Co., Inc., 721 S.W.2d 256 (Tenn. App. 1986), Duke v. Hopper, 486 S.W.2d 744 (Tenn. App. 1972).

Since this was a summary judgment action, we must take as true plaintiff's assertion that Parkwest's conduct in revoking plaintiff's privileges was inconsistent with his earlier reappointment without restrictions. However, equitable estoppel does not apply unless plaintiff detrimentally relied upon Parkwest's actions. This the plaintiff has not shown. Plaintiff states that "Plaintiff detrimentally relied on his reappointment without

22

restrictions in July 1991 and he was irreparably harmed and damaged as a result of Parkwest's subsequent change of position." Such cursory and conclusory statements do not provide sufficient evidence that plaintiff relied upon or was detrimentally harmed as a result of Parkwest's alleged "change of position." We find that there is not a sufficient basis to warrant a trial on this issue. "Estoppel is not favored and it is the burden of the party seeking to invoke the estoppel to prove each and every element of an estoppel." Bokor v. Holder, 722 S.W.2d 676, 680 (Tenn. App. 1986).

## RES JUDICATA/COLLATERAL ESTOPPEL

The plaintiff's final issue concerns the application of res judicata and/or collateral estoppel. Plaintiff claims, and Parkwest admits, that the Board of Directors took action on the recommendation of the peer review committee to revoke plaintiff's privileges without giving plaintiff a chance to respond, in violation of Parkwest's bylaws. The Board's action was later rescinded, and a hearing took place. Plaintiff claims that this second hearing should not have occurred because it subjected him to the equivalent of "peer review double jeopardy."

We believe that neither the doctrine of res judicata nor collateral estoppel have any application to this case. We also note that both doctrines apply to final judgments, and we feel that the action of the Parkwest Board in rescinding its previous decision was not a final decision on its part, but was a continuation of the original proceeding to cure a procedural defect.

23

As to double jeopardy, it is well-settled law, requiring no discussion, that double jeopardy has no application in civil cases involving individuals as parties as opposed to state agencies. The civil counterpart is the doctrine of res judicata.

> The doctrine of res judicata is that an existing final judgment rendered upon the merits by a court of competent jurisdiction is conclusive of the rights, questions and facts in issue as to the parties and their privies in the same action in other judicial tribunals of concurrent jurisdiction.

Phillips v. GMC, 669 S.W.2d 665 (Tenn. App. 1984).

This case has not previously been disposed of on its merits by a court of competent jurisdiction, hence, the doctrine of res judicata does not apply.

For the reasons set forth above, the judgment of the trial court is affirmed in all respects. Costs of appeal are taxed to the plaintiff/appellant.

_____
Don T. McMurray, Judge

CONCUR:

_____
Houston M. Goddard, Presiding Judge

_____
Herschel P. Franks, Judge

24

## APPENDIX A

**Plaintiff's Allegations of Violations of the Bylaws of Parkwest Hospital**

1.  Plaintiff was not given notice of proposed adverse action against him in violation of the Bylaws prior to the immediate termination and revocation of his clinical privileges by the MEC [Medical Executive Committee] and the Parkwest Board on January 24, 1992.

2.  Plaintiff was not given an opportunity for a hearing in violation of the Fair Hearing Plan of the Bylaws prior to the immediate termination and revocation of his privileges of January 24, 1992.

3.  The Parkwest Board prematurely and improperly acted on January 24, 1992, on the MEC's recommendation absent any record of a hearing proceeding pursuant to the requirements of the Fair Hearing Plan of the Bylaws.

4.  There was no report or written document evidencing the action or basis upon which the Parkwest Board undertook consideration of the recommendation of the MEC for revocation and termination of Plaintiff's clinical privileges on January 24, 1992, in violation of the requirements of the Fair Hearing Plan of the Bylaws.

5.  All of Plaintiff's requests for minutes, reports, writings with respect to the action taken by this Board on January 24, 1992 or the basis for that action were denied and refused.

6.  The summary suspension of a physician under Article 8.2-1 of the Bylaws without a hearing may only occur when he exhibits a dependency on drugs or alcohol or because the safety of life of a patient and in this hospital is at risk, and the action taken against Plaintiff, which was the equivalent of a summary suspension, was improper and unsubstantiated and in complete violation of the Bylaws and Fair Hearing Plan of the Bylaws.

7.  The Bylaws require that a recommendation for revocation of clinical privileges is deemed adverse when it has been recommended by the MEC and that a practitioner against whom an adverse action has been recommended is to be given prior notice of the action which notice is to include the Practitioner's right to a hearing pursuant to the provisions of the medical staff Bylaws and the Fair Hearing Plan. This was not done. Plaintiff was not notified until after the MEC and Parkwest Board already had revoked and terminated his privileges and staff appointment on January 24, 1992.

25

8. Prior to the action which was taken on January 24, 1992, the By-Laws and Fair Hearing Plan of the Bylaws required that Plaintiff be given notice of his right to a hearing with the subsequent right to appeal the decision to the Board of Trustees as an appellate body. The Parkwest Board's actions of January 24, 1992 violated the Bylaws by improperly involving the Parkwest Board of Directors in adverse action contrary to Plaintiff's right to a prior due process hearing.

9. The impartiality of the MEC and the Parkwest Board was compromised by virtue of its premature action on January 24, 1992, because of a failure to follow the requirements of the Bylaws and Fair Hearing Plan and the MEC tainted the Parkwest Board with undue prejudicial bias which rendered it impossible for Parkwest or its Board to fairly proceed in a second decision on the same charges. All of the subsequent charges against Plaintiff were tainted with prejudicial bias and are fatally flawed procedurally.

10. Article 8.1-2 of the Bylaws requires that all requests for corrective action against a Practitioner shall be in writing and submitted to the MEC at the commencement of any attempt to institute corrective action against Plaintiff, and supported by reference to the specific activities or conduct which constitute the ground for the request. This was not done. Both the initial action of January 24, 1992, and the subsequent action, violated these provisions of the Bylaws. There never was a request for corrective action which met the requirements of the Bylaws.

11. Corrective action sought against Plaintiff was not initiated by the MEC, the CEO or the Parkwest Board as required by Article 8.1-1 of the Bylaws. This Article delineates the only parties who may initiate such corrective action. Instead the action, culminating in revocation of the Plaintiff's privileges, was initiated by an Ad Hoc Committee from the Surgical Patient Care Evaluation Committee which was not authorized, and is not a party authorized under the Bylaws to initiate such charges.

12. No request for corrective action was reported to the Chief of Surgery as required by Article 8.1-3 of the Bylaws.

13. As required by Article 8.1-3 of the Bylaws, there was no investigation conducted of a request for corrective action by the Chief of Surgery and since there was no request for corrective action, the Chief of Surgery could not have appointed an Ad Hoc Committee to investigate as required by Article 8.1-3.

14. The Ad Hoc Committee was selected prior to any request for corrective action ever being made against Plaintiff, and in advance of and in anticipation of the committee meeting in which the decision to review "trended cases." There is no provision

26

in the Bylaws for an investigation of this type, absent a request for corrective action.

15. No report of the Chief of Surgery or an Ad Hoc Committee (appointed by the Chief of Surgery) was made to the MEC within thirty (30) days of receipt of the request for corrective action as required by Article 8.1-3 of the Bylaws absent which no corrective action is timely and thus violates the Bylaws.

16. Since the Ad Hoc Committee was not duly appointed and did not file any report within thirty (30) days of receipt of a request for corrective action, the MEC did not have authority to take any action on the January 20, 1992, report of the improperly constituted AHC, which report also was not filed within thirty (30) days from the date the AHC began its investigation as required by and in violation of Article 8.1-3 of the Bylaws. Any adverse action against Plaintiff by the MEC based upon such untimely and unauthorized report of the AHC was in violation of Article 8.1-4 of the Bylaws, and was unauthorized.

17. Article 2.1 of the Fair Hearing Plan was breached and violated because the Hospital and medical staff failed to convene the May 16-17 hearing within the thirty (30) day time limit from the date that Plaintiff requested a hearing on February 14, 1992.

18. The letter of the Parkwest Board of Directors to Plaintiff dated February 3, 1992, which revokes the action of the Parkwest Board taken on January 24, 1992, asserted that the MEC was acting pursuant to Article 8.1-4(b) of the Bylaws in recommending revocation of Plaintiff's privileges on January 23, 1992. Article 8.1-4(b) of the Bylaws was violated because there was no department report conforming to the requirements of the Bylaws upon which the MEC could have properly acted. The subsequent adverse action of the MEC was in violation of the Bylaws and Fair Hearing Plan of the Bylaws.

19. Article 8.1-4 of the Bylaws was also violated because the action taken by the MEC on January 23, 1992 was not reported in writing to the Surgery Department as required.

20. The letter of the Parkwest Board of Directors to Plaintiff of February 3, 1992, improperly invokes provisions requiring Plaintiff to exercise his procedural rights in spite of the fact that the Hospital has failed to comply with the By-Laws. The letter states the adverse action of the MEC was based upon "a written report by an Ad Hoc Committee appointed by the Surgical Patient Care Evaluation Committee." There was no corrective action request upon which the MEC could, or did, act. Insistence that Plaintiff pursue his hearing remedies was therefore in violation of the Bylaws and the Fair Hearing Plan. The action rescinding the Board's revocation vote constituted final action on the recommendation or [sic] the MEC. There was no subsequent recommendation or action of the MEC. Continuation of the Process was not based on any pending recommendation

27

constituting adverse action and therefore continuation of action against Plaintiff was improper.

21. The Parkwest Board of Directors' revocation on February 3, 1992, of its earlier improper adverse action of January 24, 1992, did not cure the violations and breaches of the Bylaws which had already occurred, nor did it cure the damage to Plaintiff's practice caused by the previous wrongful and unlawful summary suspension by the MEC and the Parkwest Board.

22. The five member Ad Hoc Committee exceeded the scope of its appointment by not limiting its review solely to all previously "trended" cases, of which there were only three. If the Helen Parker case were included, there would have been four such cases. The extension of their review to all cases which had been identified in the Quality Assurance process, but not "trended", was not authorized. The Ad Hoc Committee also had no authority from the Department of Surgery or any other properly constituted body to bring charges or make recommendations for sanctions against Plaintiff, nor were they authorized to do so under the Bylaws.

23. Plaintiff's right to be treated fairly was violated by denial of his request for minutes, tapes, or other documents which memorialized the Ad Hoc Committee's deliberations.

24. Plaintiff was not furnished a copy of the AHC's January 20, 1992, report until provided by the hospital's attorney on April 23, 1992. The AHC met with Plaintiff only once, on January 9, 1992, at which time only three cases were discussed, two of which they advised presented no problems. The report adopted eleven (11) days later and presented to the MEC was kept secret from the Plaintiff. The action of the MEC and immediate subsequent action of the Board of Directors occurred without Plaintiff being given notice as required, nor was there any attempt at substantial compliance with the positive requirements of the Bylaws.

25. The alleged notice of the hearing from Parkwest's attorney, dated March 26, 1992, violates the Fair Hearing Plan in that it fails to contain a "concise statement" of Plaintiff's alleged acts or omissions, fails to contain a list by number of the specific or representative patient records and questions and/or other reasons or subject matter forming the basis for the recommended adverse action of the MEC as required by Article II of the Fair Hearing Plan.

26. The hospital's attorney represented, counseled, advised, communicated, and met with the hospital Administrator, members of the MEC (the charging party), the Ad Hoc Committee (the prosecutors), the Hearing Panel (the initial decision makers), and the Parkwest Board of Directors (the decision makers on appeal). By this multiple representation by the Parkwest attorneys, of which Parkwest was aware, Parkwest violated the fundamentals of fairness and tainted the process with undue bias

28

in violation of the articulated purposes of the Bylaws and the Fair Hearing Plan.

27. Parkwest reversed its earlier representation that Plaintiff would be allowed to be represented at the hearing by his attorneys, that attorneys must be involved throughout the proceeding and that he would have the right to take proof of witnesses by deposition. Failure to permit Plaintiff to exercise these rights after initially agreeing to them violates Sections 3.4 and 3.5 of the Fair Hearing Plan and Section 8.2 of the Fair Hearing Plan.

28. It was basically unfair and a violation of Plaintiff's due process rights to prohibit his attorneys even to be on site at the Hospital outside of the hearing room so that he could consult with them after he was denied the right to be represented in the hearing or have them available for consultation in the hearing.

29. Plaintiff made repeated requests that the Parkwest medical staff notify him of patient specific charges or deficiencies which never was properly done in violation of Article II of the Fair Hearing Plan of the Bylaws.

30. Parkwest violated the notice requirements in the Bylaws by attempting to add an additional charge regarding an occurrence involving an incident report dated March 20, 1992, for determination by the Hearing Panel, which charge had not been previously presented to the MEC. Such action also violates Sections 8.1-1, 8.1-2, 8.1-3, 8.1-4, and 8.1-5 of the Bylaws and the Fair Hearing Plan.

31. Parkwest violated Plaintiff's rights in refusing to tell Plaintiff who or what witnesses would be called by Parkwest to testify.

32. Parkwest violated Plaintiff's rights in refusing to notify Plaintiff as to how many witnesses would be called by Parkwest to testify.

33. Parkwest required through its attorney and representative that all proof at the hearing be restricted to live witnesses in violation of Article 3.5 of the Fair Hearing Plan of the Bylaws which provided that "any relevant matter upon which responsible persons customarily rely in the conduct of serious affairs shall be admitted regardless of admissibility of such evidence in a court of law." Under the Bylaws any form of written or recorded material was to be admitted, which right was denied to Plaintiff. Certainly the hospital utilized medical charts and other written data containing observations and opinions of various people without requiring them to be present to testify.

34. Once attorneys were prohibited from participating in the hearing process, Parkwest violated this ruling by ex parte contact between the attorney representing the hospital and members of

29

the Hearing Panel, which communication or contact occurred before and after the hearing. Ex parte contact likewise occurred with respect to the Board of Directors.

35. Parkwest and its Medical Executive Committee erred and violated Plaintiff's rights and violated the spirit and intent of Section 2.3-3 of the Fair Hearing Plan by appointing orthopedic surgeons to the Ad Hoc Committee who were competitors of Plaintiff.

36. Parkwest and its Medical Executive Committee violated Plaintiff's rights and violated the spirit and intent of Section 2.3-3 of the Fair Hearing Plan by allowing orthopedic surgeons in competition with Plaintiff to act as members of the Hearing Panel.

37. Parkwest tainted the process with bias and conflict and violated the spirit and intent of Section 2.3-3 of the Fair Hearing Plan by appointing to the Hearing Panel, the initial decision makers, physicians whose practice group partners were also members of the Ad Hoc Committee which was the investigatory and prosecutorial body.

38. Parkwest tainted the process with bias and conflict of interest and violated the spirit and intent of Section 2.3-3 of the Fair Hearing Plan by appointing physicians to act as members of the Hearing Panel, the initial decision makers, whose practice group partners were also members of the MEC, the charging body whose recommendation initiated the proceeding.

39. Parkwest failed to follow the confidentiality requirements except to assert them to keep information, vital to Plaintiff's defense, secret and unavailable to him by asserting that the documents were privileged.

40. Parkwest violated the spirit, intent and provisions of Section 3.9 of the Fair Hearing Plan by failing to grant Plaintiff's timely request for postponement of the hearing based upon the addition of the 23rd patient case just prior to the start of the hearing. Parkwest failed to give the seven day required notice as to inclusion of this patient case. There was no notice given as to this patient chart. Therefore, the 30 day notice provision of HCQIA was violated.

41. Parkwest violated the spirit, intent and provisions of Section 3.9 of the Fair Hearing Plan by failing to grant Plaintiff's timely request for postponement of the hearing based upon the inclusion of new, different and additional charges first identified to Plaintiff in the 19-page summary filed on the first day of the hearing. Neither the seven day notice required by the Bylaws nor the 30 day notice required by HCQIA were given. These notice requirements were violated.

42. The hospital used medical records of Medicaid patients against Plaintiff in violation of T.C.A. §§ 10-7-504 and T.C.A. § 68-11-305(c) and in violation of the patients' specific refusal to

30

grant consent for the use of their records in any adverse action against Plaintiff.

43. Parkwest violated Plaintiff's rights by using the medical records and charts of his patients against him after those patients had specifically in writing withdrawn their consent for use of their records and filed written objections to the use of their records in any adverse action against Plaintiff. Letters from 14 patients were received by Parkwest refusing to grant or give any authority to the hospital to use that patient's medical records for any purpose to take adverse action. The use of these patients' records without the consent of the patients and contrary to the patients' objections was a violation of the implied condition of the contract between Plaintiff and his patient that no confidential information gained through the relationship would be released without the patient's permission. Neither Parkwest not the MEC had authorization from any of the 22 or 23 patients involved in the focused review to use those patients' medical records in any proceeding against Plaintiff, and the use of those records by Parkwest was improper and unauthorized.

44. Parkwest assisted, encouraged, and allowed the AHC to go beyond its instruction and its presumed authority for existence when the AHC reviewed 19 of Plaintiff's Quality Assurance Charts which had not been trended. The AHC's authorization, if any, to conduct an investigation, was limited to a "focused review" of "previously trended" cases. The AHC violated that authorization.

45. The AHC undertook an investigation without there being a request for corrective action in writing, as required to detail the specific activities or conduct constituting the grounds for the request, as required by Section 8.1-2 of the Bylaws. The only description the AHC had as to "the matter" to be investigated was to review "previously trended" cases; therefore, the review actually conducted was in excess of the only notice or instruction the AHC had as to the matter to be reviewed. The AHC's action violated the spirit and intent of Section 8.1-3 of the Bylaws.

46. Parkwest violated the hearing prerequisites of the Fair Hearing Plan in Article II by adding a 23rd patient chart, the Helen Parker chart, less than seven (7) days prior to the date of the hearing and in violation of the seven (7) days' notice requirement to Plaintiff of the charges against him as required under Article II of the Fair Hearing Plan of the Bylaws.

47. The Chairman of the Hearing Panel knew that no adverse trends existed in these three trended cases reviewed by the Ad Hoc Committee and that no adverse action would have been warranted on the basis of those three trended cases.

48. Parkwest violated the credentialling process and reappointment review process of the Bylaws by advising the AHC or the MEC or

31

the Hearing Panel to consider matters or incidents relating to patient charts that predated Plaintiff's last appointment to the medical staff on July 31, 1991.

49. Parkwest violated the Fair Hearing Plan and the credentialling and reappointment provisions of the Bylaws by allowing the Quality Assurance coordinator, the AHC, the MEC, or the Hearing Panel to use stale, stockpiled Quality Assurance matters and medical records from a period of many prior years and then utilize them in a "stacked deck" fashion against Plaintiff in a prearranged plan to remove his staff appointment, when Plaintiff had been investigated (including the time period for all of the 23 charts) and reappointed without any restrictions to the staff during that period. The latest reappointment on July 31, 1991 was subsequent to all of the surgical procedures reviewed by the Ad Hoc Committee.

50. Parkwest violated the fairness provisions of the Fair Hearing Plan and the Quality Assurance provisions of the Bylaws and it was improper, arbitrary and capricious for the AHC or the MEC to claim that Plaintiff deviated from established procedures or used obsolete methods when no medical staff or hospital policy ever existed which established the proper procedure to be used.

51. Parkwest violated the fairness provisions of the Fair Hearing Plan and Quality Assurance provisions of the Bylaws and it was improper, arbitrary and capricious for the Ad Hoc Committee or the Medical Executive Committee to allege that the use of a hemovac drain in a knee joint is poor clinical judgment when no hospital policy or guidelines existed prohibiting the use of such drain, and when in fact use of such drain is commonplace by other surgeons in this Hospital.

52. Parkwest violated the fairness provisions of the Fair Hearing Plan and the Quality Assurance provisions of the Bylaws and it was improper and error for the Medical Executive Committee or the Ad Hoc Committee to assert that multiple bilateral simultaneous procedures performed by Plaintiff were improper when the hospital had no policy or guidelines with respect to such multiple simultaneous procedures, and when in fact such multiple or bilateral procedures routinely were performed by other surgeons during that time frame.

53. Parkwest violated the fairness provisions of the Fair Hearing Plan and the due process requirements of HCQIA and the spirit and intent of providing for separations of functions in the hearing process, where the AHC, the MEC, the Hearing Panel and the Parkwest Board of Directors, were required to and did utilize one representative for all of them. The same attorneys served as spokesman, representative and legal counsel for all of these committees and groups in addition to serving in such function for Parkwest administration.

32

54. The AHC knew that the normal Quality Assurance process had not been followed with regard to Plaintiff, prior to the peer review hearing.

55. Parkwest violated the medical records provisions of the Bylaws included in the Rules and Regulations at Section VI-8 and the spirit and intent of the Fair Hearing Plan by requiring Plaintiff to pay 25 cents a page to copy and have limited access to the medical records of his own patients, when other members of the active staff had free access to such records. Plaintiff was refused direct access to the medical records of his patients and could only see the medical records upon prearrangement through, and at the office of, the hospital's attorney.

56. Prior to the hearing, the hospital, through its attorney, advised Plaintiff that the two page Ad Hoc Committee report was the sole source of the charges against which Plaintiff must defend. The day before the hearing, Parkwest's attorney stated again in Plaintiff's presence that the AHC report to be presented the next day was two pages long. Parkwest deliberately mislead Plaintiff as to the nature of the charges against him. In fact, prior to the hearing, the Ad Hoc Committee had already developed a 19-page summary of charges containing numerous new charges and criticism, and these new charges were made available to members of the Hearing Panel prior to the commencement of the hearing but without providing the report to Plaintiff. Plaintiff was denied the opportunity to review charges within the time required by the Fair Hearing Plan. Plaintiff was not given 30 days nor even seven days prior notice. Plaintiff was effectively denied rights granted under Section 2.1, 2.2, 3.4, and 3.5 of the Fair Hearing Plan.

57. The new charges prepared by the Ad Hoc Committee were never approved or authorized by the MEC and the use of these additional charges violated the corrective action provisions of the Bylaws, and violated the Fair Hearing Plan and violated the other process provisions of HCQIA.

58. Prior to the hearing the Hearing Panel was provided access to evidence to be presented by Parkwest against Plaintiff and was given an opportunity to review this evidence without Plaintiff's knowledge and without Plaintiff being granted an opportunity to present or cross examine the evidence against him in violation of the corrective action provisions of the Bylaws and in violation of the Fair Hearing Plan.

59. During the peer review hearing, the Hearing Panel violated the fairness provisions of the Fair Hearing Plan when it improperly refused to grant Plaintiff a continuance to prepare proof in defense of the 23rd chart regarding Helen Parker which was added to the hearing on May 15, 1992, on the eve of the commencement of the hearing, and without seven days' notice of the charges as required by the Fair Hearing Plan of the Bylaws.

33

60. The Hearing Panel violated the Fair Hearing Plan of the Bylaws and violated and erred in making findings and conclusions regarding the Helen Parker, the 23rd chart, since no charges and no description of claimed deficiencies regarding that specific case were made prior to the start of the hearing. The notice requirements of the Bylaws was violated by conducting a hearing on this chart without seven days' notice as required.

61. Parkwest violated the Fair Hearing Plan of the Bylaws and the corrective action provisions of the Bylaws in allowing the Ad Hoc Committee to make new, different and additional charges from its new 19-page Case Summary report which was never given to Plaintiff prior to the hearing, but was given to the hospital and to the Hearing Panel prior to the hearing.

62. The Fair Hearing Plan was violated by terminating Plaintiff's privileges based on the new charges contained in the Ad Hoc Committee's Case Summary, first given to Plaintiff on the first day of the hearing.

63. Article II of the Fair Hearing Plan was violated by failing to give notice of the new charges in the AHC's 19-page Case Summary report at least seven days before the hearing. Failure to give notice, describing the nature of the charges 30 days prior to the hearing violated requirements of HCQIA.

64. Article 3.5 of the Fair Hearing Plan was violated by refusing to allow Plaintiff to present sworn video statements from his patients and other witnesses.

65. The Fair Hearing Plan was violated by refusing and failing to give Plaintiff adequate opportunity to read or review the 19-page AHC Case Summary report first given to Plaintiff at the beginning of the hearing or to allow Plaintiff any opportunity to obtain witnesses and proof in order to defend the new, different and additional charges in this report.

66. The intra hearing use of medical records of Medicaid patients without their prior consent was a violation of T.C.A. § 10-7-504.

67. The Fair Hearing Plan was violated by not advising Plaintiff as to the issues or charges upon which information was sought so that he related to these issues or charges. Rather the Hearing Panel just sought access to Plaintiff's office records for their review without identifying the issue involved. Subsequent to the hearing, the Hearing Panel first identified issues or criticisms allegedly based on their review, present testimony himself from his office records or to respond directly to questions.

68. The fairness provisions of the Fair Hearing Plan were violated by allowing all five members of the Ad Hoc Committee to remain in the hearing room at the same table to collaborate as a committee of five against Plaintiff when Article 3.3 of the Fair

34

Hearing Plan only allowed the MEC to have one individual to present the facts in support of the adverse recommendation.

69. The fairness provisions of the Fair Hearing Plan and the corrective action provisions of the Bylaws were violated by the Hearing Panel becoming an investigative body which initiated new charges against Plaintiff which had not been presented to the MEC nor, in some instances, discussed or identified even in the hearing.

70. The fairness provisions of the Fair Hearing Plan were violated by allowing members of the Hearing Panel to become witnesses who testified into the record from Dr. Eyring's records, as to results of their own intra-hearing investigation. The Hearing Panel members did not submit themselves to cross examination. They were not sworn as witnesses, nor were they called to give proof. This action, and the further action of members o [sic] the Hearing Panel being witnesses as to findings or matters first identified in their report subsequent to close of the hearing, denied Plaintiff rights granted under Section 3.4 of the Fair Hearing Plan.

71. The fairness provisions of the Fair Hearing Plan and the corrective action provisions of the Bylaws were violated by making findings of fact and conclusions on new charges which were first identified solely by the Hearing Panel, either during the hearing or after the hearing for which no prior notice whatsoever was given to Plaintiff. This violated Sections 3.4 and 3.5 of the Fair Hearing Plan and was in derogation of their function under 3.7 of the Fair Hearing Plan.

72. The hospital violated the HCQIA by refusing to identify its orthopedic expert witness until the date of the hearing.

73. The Hearing Panel violated the HCQIA by allowing Dr. Hornsby, its paid orthopedic expert to testify as an expert witness on behalf of the MEC in violation of the requirement of federal law that a list of all witnesses to testify at the hearing must be given to the physician 30 days before the hearing.

74. The Hearing Panel violated the HCQIA by allowing any members of the Ad Hoc Committee to testify, because Plaintiff was not given 30 days' notice prior to the hearing, as required by HCQIA, that the AHC members would testify.

75. After the close of the hearing and before the decision of the Hearing Panel, the Plaintiff was required by HCQIA to be notified of his right to submit a written statement to the Panel. Plaintiff was not advised of this right by the Hearing Panel. This right was violated.

76. The hearing was declared adjourned on May 17, 1992, and the decision of the Hearing Panel dated June 12, 1992, was not made within 14 days as required by Article 4.1 of the Fair Hearing Plan.

35

77. The decision of the Hearing Panel was not forwarded to the Medical Executive Committee with all of the documentation considered by it from the office [of] medical records of Plaintiff in violation of Article 4.1 of the Fair Hearing Plan.

78. The Hearing Panel gave no notice to Plaintiff that it was considering new charges or issues after the time of the adjournment of the hearing, which charges or issues were never identified either prior to or during the hearing in violation of Article II and Article 3.11, of the Fair Hearing Plan, and in violation of the Bylaws.

79. After adjournment of the hearing, the Hearing Panel continued to conduct an independent investigation identifying new allegations and charges. These new and different allegations were not previously made to the MEC in January, 1992, not made before or at the time of the May 1992 hearing.

80. By identifying new charges after the hearing had adjourned, Plaintiff was denied the opportunity to present any oral or written evidence upon these new charges, in violation of the Parkwest Bylaws and Fair Hearing Plan. This same action violates provisions of HCQIA.

81. The hospital, acting through its attorney, notified Plaintiff that attorneys were prohibited from being allowed in any manner to participate in the hearing while it was in progress. Contrary to the admonition and instructions contained in the letter of Parkwest's attorney dated May 14, 1992, to the hearing officer, ex parte contact between the hospital's representative and Hearing Panel members took place. In the letter referred to, the hospital's representative said that, during deliberation or adjournments, no member of the Hearing Panel should have ex parte contact with representatives of the parties, and that the parties should have no contact with the Hearing Panel concerning any matters at issue. Ex parte contact and a meeting of the hospital's representative with the Hearing Panel occurred before the hearing took place. There were at least two instances of ex parte contact with the Hearing Panel by the hospital's representative after the hearing and before the Hearing Panel's decision.

82. On June 3, 1992, as a consequence of a letter of June 2, 1992, from the hospital's representative to the Hearing Panel Chairman, Plaintiff's attorneys wrote to the hospital's attorney requesting that Parkwest cease from communicating and advising the Hearing Panel to refrain from any other type of advice or contact. By letter of May 13, 1992, Plaintiff's attorneys had objected to an ex parte contact by the hospital's attorney-representative with Hearing Panel members. Plaintiff objected to the hospital's counsel undertaking to assist the Hearing Panel or having contact with its members. Despite this, ex parte contact occurred.

36

83. On June 3, 1992, the hospital's attorney-representative sent to the Hearing Panel a copy of an inflammatory and self-serving letter addressed to Plaintiff's attorneys, which was highly prejudicial to Plaintiff's interest. This again was ex parte contact. On June 4, 1992 Plaintiff's attorneys again wrote to the hospital's attorney, (with no copy to the Hearing Panel), requesting that he cease communications with the Hearing Panel and discontinue attempts which might well influence or prejudice their decision. The continued communications by the hospital's designated representative with the Hearing Panel were very prejudicial to Plaintiff and were improper and in violation of the hospital's ruling to not allow attorneys to participate in the process, and in violation of the ruling of the Presiding Officer that attorneys could not participate in the process hearing.

84. The Parkwest Board wrongfully denied Plaintiff, and/or his attorney an opportunity to appear before the Parkwest Board of Directors. As previously discussed, the hospital's representative engaged in ex parte contact with the Board during the period of their consideration of the case.

85. The MEC and the Parkwest Board of Directors, after the peer review hearing, were precluded from adopting the recommendations of the Hearing Panel because the earlier rescission of the termination of Plaintiff's medical staff membership and privileges represented biased action on this recommendation; no new peer review action could occur without the initiation of a proper request for corrective action, and setting forth the basis for recommended action. The July 1992 termination of Plaintiff's medical staff privileges violated the corrective action and reappointment provisions of the Bylaws.

86. The Board of Directors did not act on any properly conducted request for corrective action but adopted the unanimous view of the MEC regarding an unauthorized focused review in violation of the Bylaws.

87. In addition to violations of the Bylaws and Fair Hearing Plan, actions of Parkwest violate provisions of the Health Care Quality Improvement Act (HCQIA). The AHC as a representative of Parkwest seeking adverse action provided information as to his treatment and care which was false and known by them to be false.

88. The action taken in this case was not taken in the reasonable belief that it was in furtherance of quality health care, nor was it taken after reasonable effort to obtain the facts of the matter. There was no showing of any prior counseling as to suggested problems in Plaintiff's practice; his history at Parkwest revealed that all prior reviews of his practice concluded that there were no problems with his patient treatment or care. There was certainly no reasonable effort to obtain the facts of the matter when charges, criticisms or issues are deliberately and actively kept from him so as to preclude his

37

opportunity to discuss or meaningfully prepare and present evidence.

89. Plaintiff was not given adequate notice as described by HCQIA. He was not given notice at all of the January 24, 1992 action; thereafter he was given a notice as set out in his affidavit. The notice to be given under HCQIA was to tell him of proposed action and the reasons for the proposed action. This was violated -- HCQIA granted him 30 days within which to request a hearing instead of the 14 days set by Parkwest's Bylaws. The Act provides that a requested hearing shall not be less than 30 days after the date of notice and that notice is to include a list of the witnesses expected to testify on behalf of the review body. This was violated. Despite Plaintiff's request, the hospital did not provide such information. The hospital did advise just prior to the hearing that Dr. Burns, and perhaps others of the AHC would testify. While stating on May 15, 1992 that the hospital might use an orthopedic surgeon, it refused to identify that individual.

90. The requested hearing was not held before a mutually acceptable arbitrator, or a hearing officer not in competition with Plaintiff, or a panel of individuals not in competition with him. The make-up of the hearing panel therefore violated the provision of HCQIA.

91. Under HCQIA, he had the right to representation by an attorney in the hearing. He was denied that right. His right to call, examine and cross-examine witnesses was effectively precluded by the active and deliberate withholding of information as to the criticisms to be presented.

92. The Bylaws required that his reappointment was to be determined on the basis of evaluation of his professional competence. The hospital was to collect and obtain information deemed pertinent regarding his professional activities and conduct in the hospital. Under the Bylaws, the Chairman was to review the information and make a recommendation as to renewal of his appointment and privileges. The Credentials and Privileges Committee was to review his qualifications and all other pertinent information and make a recommendation as to renewal of his appointment and privileges. The MEC also was to review all other relevant information and make its recommendation. All of these committees and individuals did as they were required with the result that he was reappointed routinely for years, and his last reappointment was in July 1991. The Bylaws say as to each recommendation described above that it ". . . shall be based upon such appointee's professional performance, ability and clinical judgment in the treatment of patients, his or her discharges of staff obligations, his or her compliance with staff Bylaws, rules and regulations, his or her cooperation with other staff members and with patients, and other matters bearing out his or her ability and willingness to contribute to the quality of patient care practices in the hospital that are optimally achievable." Based upon that standard, he was

38

reappointed in July, 1991. All of the patient cases complained of in the subsequent review had occurred prior to July, 1991. On the basis of quality of patient care he was determined to be in conformity with the required standard of care and treatment at Parkwest. The subsequent peer review and revocation of his privileges conflicted and was inconsistent with the review of his qualifications during reappointment to the medical staff.

93.     As to all these patient cases involved in the 1991 peer review, Parkwest violated the spirit and intent of the Fair Hearing Plan by claiming that he deviated, in some fashion, from established procedures when there was no policy or procedure in place anywhere his privileges had been renewed based upon his compliance with hospital rules and regulations and his professional performance, ability and clinical judgment.

94.     The Quality Assurance review processes had determined that each case of the 22 patients reviewed was appropriate with one exception. Parkwest violated the spirit and intent of the Fair Hearing Plan by subjecting his patient care to repetitious review after findings demonstrating appropriate care.

39

IN THE COURT OF APPEALS

| | | |
|---|---|---|
| EDWARD J. EYRING, M.D., | ) | KNOX CIRCUIT |
| | ) | C.A. NO. 03A01-9607-CV-00240 |
| Plaintiff-Appellant | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| vs. | ) | HON. WHEELER A ROSENBALM |
| | ) | JUDGE |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| FORT SANDERS PARKWEST MEDICAL | ) | AFFIRMED AND REMANDED |
| CENTER, INC., and FORT SANDERS | ) | |
| ALLIANCE, INC., | ) | |
| | ) | |
| Defendants-Appellees | ) | |

**JUDGMENT**

This appeal came on to be heard upon the record from the Circuit Court of Knox County, briefs and argument of counsel. Upon consideration thereof, this Court is of the opinion that there was no reversible error in the trial court.

The judgment of the trial court is affirmed in all respects. Costs of appeal are taxed to the plaintiff/appellant.

PER CURIAM